# STOGNER *v.* CALIFORNIA

No. 01–1757.   Argued March 31, 2003—Decided June 26, 2003

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined, *post*, p. 633.

*Roberto Nájera* argued the cause for petitioner. With him on the briefs was *Elisa Stewart*.

*Janet Gaard*, Special Assistant Attorney General of California, argued the cause for respondent. With her on the brief were *Bill Lockyer*, Attorney General, *Manuel M. Medeiros*, Solicitor General, *Robert R. Anderson*, Chief Assistant Attorney General, *W. Scott Thorpe*, Special Assistant Attorney General, and *Kelly E. Lebel*, Deputy Attorney General.

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General Chertoff, Deputy Solicitor General Dreeben*, and *John F. De Pue*.*

---

*Briefs of *amici curiae* were filed for the American Psychological Association et al. by *Kathleen A. Behan, Christopher D. Man*, and *Nathalie F. P. Gilfoyle;* and for the National Association of Criminal Defense Law-

JUSTICE BREYER delivered the opinion of the Court.

California has brought a criminal prosecution after expiration of the time periods set forth in previously applicable statutes of limitations. California has done so under the authority of a new law that (1) permits resurrection of otherwise time-barred criminal prosecutions, and (2) was itself enacted *after* pre-existing limitations periods had expired. We conclude that the Constitution's *Ex Post Facto* Clause, Art. I, § 10, cl. 1, bars application of this new law to the present case.

I

In 1993, California enacted a new criminal statute of limitations governing sex-related child abuse crimes. The new statute permits prosecution for those crimes where "[t]he limitation period specified in [prior statutes of limitations] has expired"—provided that (1) a victim has reported an allegation of abuse to the police, (2) "there is independent evidence that clearly and convincingly corroborates the victim's allegation," and (3) the prosecution is begun within one year of the victim's report. 1993 Cal. Stats. ch. 390, § 1 (codified as amended at Cal. Penal Code Ann. § 803(g) (West Supp. 2003)). A related provision, added to the statute in 1996, makes clear that a prosecution satisfying these three conditions "shall revive any cause of action barred by [prior statutes of limitations]." 1996 Cal. Stats. ch. 130, § 1 (codified at Cal. Penal Code Ann. § 803(g)(3)(A) (West Supp. 2003)). The statute thus authorizes prosecution for criminal acts committed many years beforehand—and where the original limitations period has expired—as long as prosecution begins within a year of a victim's first complaint to the police.

In 1998, a California grand jury indicted Marion Stogner, the petitioner, charging him with sex-related child abuse committed decades earlier—between 1955 and 1973. With-

yers et al. by *David M. Porter, Barry T. Simons, Martin N. Buchanan,* and *Michael B. Dashjian.*

out the new statute allowing revival of the State's cause of action, California could not have prosecuted Stogner. The statute of limitations governing prosecutions at the time the crimes were allegedly committed had set forth a 3-year limitations period. And that period had run 22 years or more before the present prosecution was brought.

Stogner moved for the complaint's dismissal. He argued that the Federal Constitution's *Ex Post Facto* Clause, Art. I, § 10, cl. 1, forbids revival of a previously time-barred prosecution. The trial court agreed that such a revival is unconstitutional. But the California Court of Appeal reversed, citing a recent, contrary decision by the California Supreme Court, *People* v. *Frazer*, 21 Cal. 4th 737, 982 P. 2d 180 (1999), cert. denied, 529 U. S. 1108 (2000). Stogner then moved to dismiss his indictment, arguing that his prosecution is unconstitutional under both the *Ex Post Facto* Clause and the Due Process Clause, Amdt. 14, § 1. The trial court denied Stogner's motion, and the Court of Appeal upheld that denial. *Stogner* v. *Superior Court*, 93 Cal. App. 4th 1229, 114 Cal. Rptr. 2d 37 (2001). We granted certiorari to consider Stogner's constitutional claims. 537 U. S. 1043 (2002).

## II

The Constitution's two *Ex Post Facto* Clauses prohibit the Federal Government and the States from enacting laws with certain retroactive effects. See Art. I, § 9, cl. 3 (Federal Government); Art. I, § 10, cl. 1 (States). The law at issue here created a new criminal limitations period that extends the time in which prosecution is allowed. It authorized criminal prosecutions that the passage of time had previously barred. Moreover, it was enacted after prior limitations periods for Stogner's alleged offenses had expired. Do these features of the law, taken together, produce the kind of retroactivity that the Constitution forbids? We conclude that they do.

First, the new statute threatens the kinds of harm that, in this Court's view, the *Ex Post Facto* Clause seeks to avoid. Long ago Justice Chase pointed out that the Clause protects liberty by preventing governments from enacting statutes with "manifestly *unjust and oppressive*" retroactive effects. *Calder* v. *Bull*, 3 Dall. 386, 391 (1798). Judge Learned Hand later wrote that extending a limitations period after the State has assured "a man that he has become safe from its pursuit . . . seems to most of us unfair and dishonest." *Falter* v. *United States*, 23 F. 2d 420, 426 (CA2), cert. denied, 277 U. S. 590 (1928). In such a case, the government has refused "to play by its own rules," *Carmell* v. *Texas*, 529 U. S. 513, 533 (2000). It has deprived the defendant of the "fair warning," *Weaver* v. *Graham*, 450 U. S. 24, 28 (1981), that might have led him to preserve exculpatory evidence. F. Wharton, Criminal Pleading and Practice § 316, p. 210 (8th ed. 1880) ("The statute [of limitations] is . . . an amnesty, declaring that after a certain time . . . the offender shall be at liberty to return to his country . . . and . . . may cease to preserve the proofs of his innocence"). And a Constitution that permits such an extension, by allowing legislatures to pick and choose when to act retroactively, risks both "arbitrary and potentially vindictive legislation," and erosion of the separation of powers, *Weaver, supra,* at 29, and n. 10. See *Fletcher* v. *Peck*, 6 Cranch 87, 137–138 (1810) (viewing the *Ex Post Facto* Clause as a protection against "violent acts which might grow out of the feelings of the moment").

Second, the kind of statute at issue falls literally within the categorical descriptions of *ex post facto* laws set forth by Justice Chase more than 200 years ago in *Calder* v. *Bull, supra*—a categorization that this Court has recognized as providing an authoritative account of the scope of the *Ex Post Facto* Clause. *Collins* v. *Youngblood*, 497 U. S. 37, 46 (1990); *Carmell, supra,* at 539. Drawing substantially on Richard Wooddeson's 18th-century commentary on the nature of *ex post facto* laws and past parliamentary abuses,

Chase divided *ex post facto* laws into categories that he described in two alternative ways. See 529 U. S., at 522–524, and n. 9. He wrote:

> "I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. *2d. Every law that aggravates a crime, or makes it greater than it was, when committed.* 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. *4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.* All these, and similar laws, are manifestly unjust and oppressive." *Calder, supra,* at 390–391 (emphasis altered from original).

In his alternative description, Chase traced these four categories back to Parliament's earlier abusive acts, as follows:

> Category 1: "Sometimes they respected the crime, by declaring acts to be treason, which were not treason, when committed."
>
> Category 2: *"[A]t other times they inflicted punishments, where the party was not, by law, liable to any punishment."*
>
> Category 3: "[I]n other cases, they inflicted greater punishment, than the law annexed to the offence."
>
> Category 4: *"[A]t other times, they violated the rules of evidence (to supply a deficiency of legal proof) by admitting one witness, when the existing law required two; by receiving evidence without oath; or the oath of the wife against the husband; or other testimony, which the courts of justice would not admit."* 3 Dall., at 389 (emphasis altered from original).

The second category—including any "law that *aggravates a crime,* or makes it *greater* than it was, when committed," *id.,* at 390—describes California's statute as long as those words are understood as Justice Chase understood them— *i. e.,* as referring to a statute that "inflict[s] *punishments,* where the party was not, by *law,* liable to *any punishment,"* *id.,* at 389. See also 2 R. Wooddeson, A Systematical View of the Laws of England 638 (1792) (hereinafter Wooddeson, Systematical View) (discussing the *ex post facto* status of a law that affects punishment by "making therein some innovation, *or creating some forfeiture or disability, not incurred in the ordinary course of law"* (emphasis added)). After (but not before) the original statute of limitations had expired, a party such as Stogner was not "liable to any punishment." California's new statute therefore "aggravated" Stogner's alleged crime, or made it "greater than it was, when committed," in the sense that, and to the extent that, it "inflicted punishment" for past criminal conduct that (when the new law was enacted) did not trigger any such liability. See also H. Black, American Constitutional Law § 266, p. 700 (4th ed. 1927) (hereinafter Black, American Constitutional Law) ("[A]n act condoned by the expiration of the statute of limitations is no longer a punishable offense"). It is consequently not surprising that New Jersey's highest court long ago recognized that Chase's alternative description of second category laws *"exactly describes* the operation" of the kind of statute at issue here. *Moore* v. *State,* 43 N. J. L. 203, 217 (1881) (emphasis added). See also H. Black, Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts, and Against Retroactive and Ex Post Facto Laws § 235, p. 298 (1887) (hereinafter Black, Constitutional Prohibitions) ("Such a statute" "certainly makes that a punishable offense which was previously a condoned and obliterated offense").

So to understand the second category (as applying where a new law inflicts a punishment upon a person not then sub-

ject to that punishment, to any degree) explains why and how that category differs from both the first category (making criminal noncriminal behavior) and the third category (aggravating the punishment). And this understanding is consistent, in relevant part, with Chase's second category examples—examples specifically provided to illustrate Chase's *alternative* description of laws "'inflict[ing] *punishments,* where the party was not, by *law,* liable to *any punishment,*'" *Calder,* 3 Dall., at 389.

Following Wooddeson, Chase cited as examples of such laws Acts of Parliament that banished certain individuals accused of treason. *Id.,* at 389, and n. ‡; see also *Carmell,* 529 U. S., at 522–524, and n. 11. Both Chase and Wooddeson explicitly referred to these laws as involving "banishment." *Calder, supra,* at 389, and n. ‡; 2 Wooddeson, Systematical View 638–639. This fact was significant because Parliament had enacted those laws not only after the crime's commission, but under circumstances where banishment "was simply not a form of penalty that could be imposed by the courts." *Carmell, supra,* at 523, n. 11; see also 11 W. Holdsworth, A History of English Law 569 (1938). Thus, these laws, like the California law at issue here, enabled punishment where it was not otherwise available "in the ordinary course of law," 2 Wooddeson, Systematical View 638. As this Court previously recognized in *Carmell, supra,* at 523, and n. 11, it was *this* vice that was relevant to Chase's purpose.

It is true, however, that Parliament's Acts of banishment, unlike the law in this case, involved a punishment (1) that the legislature imposed directly, and (2) that courts had *never* previously had the power to impose. But these differences are not determinative. The first describes not a retroactivity problem but an attainder problem that Justice Chase's language does not emphasize and with which the Constitution separately deals, Art. I, § 9, cl. 3; Art. I, § 10, cl. 1. The second difference seems beside the point. The example of

Parliament's banishment laws points to concern that a legislature, knowing the accused and seeking to have the accused punished for a pre-existing crime, might enable punishment of the accused in ways that existing law forbids. That fundamental concern, related to basic concerns about retroactive penal laws and erosion of the separation of powers, applies with equal force to punishment like that enabled by California's law as applied to Stogner—punishment that courts lacked the power to impose at the time the legislature acted. See Black, Constitutional Prohibitions § 235, at 298 ("It would be superfluous to point out that such an act [reviving otherwise time-barred criminal liability] would fall within the evils intended to be guarded against by the prohibition in question"). Cf. 1 F. Wharton, Criminal Law § 444a, pp. 347–348, n. *b* (rev. 7th ed. 1874) (hereinafter Criminal Law).

In finding that California's law falls within the literal terms of Justice Chase's second category, we do not deny that it may fall within another category as well. Justice Chase's fourth category, for example, includes any "law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*" *Calder, supra,* at 390. This Court has described that category as including laws that diminish "the quantum of evidence required to convict." *Carmell, supra,* at 532.

Significantly, a statute of limitations reflects a legislative judgment that, after a certain time, no quantum of evidence is sufficient to convict. See *United States* v. *Marion,* 404 U. S. 307, 322 (1971). And that judgment typically rests, in large part, upon evidentiary concerns—for example, concern that the passage of time has eroded memories or made witnesses or other evidence unavailable. *United States* v. *Kubrick,* 444 U. S. 111, 117 (1979); 4 W. LaFave, J. Israel, & N. King, Criminal Procedure § 18.5(a), p. 718 (1999); Wharton, Criminal Pleading and Practice § 316, at 210. Indeed, this

Court once described statutes of limitations as creating "a presumption which renders proof unnecessary." *Wood* v. *Carpenter*, 101 U. S. 135, 139 (1879).

Consequently, to resurrect a prosecution after the relevant statute of limitations has expired is to eliminate a currently existing conclusive presumption forbidding prosecution, and thereby to permit conviction on a quantum of evidence where that quantum, at the time the new law is enacted, would have been legally insufficient. And, in that sense, the new law would "violate" previous evidence-related legal rules by authorizing the courts to "'receiv[e] evidence . . . which the courts of justice would not [previously have] admit[ted]'" as sufficient proof of a crime, *supra,* at 612. Cf. *Collins*, 497 U. S., at 46 ("Subtle *ex post facto* violations are no more permissible than overt ones"); *Cummings* v. *Missouri*, 4 Wall. 277, 329 (1867) (The *Ex Post Facto* Clause "cannot be evaded by the form in which the power of the State is exerted"). Nonetheless, given Justice Chase's description of the second category, we need not explore the fourth category, or other categories, further.

Third, likely for the reasons just stated, numerous legislators, courts, and commentators have long believed it well settled that the *Ex Post Facto* Clause forbids resurrection of a time-barred prosecution. Such sentiments appear already to have been widespread when the Reconstruction Congress of 1867—the Congress that drafted the Fourteenth Amendment—rejected a bill that would have revived time-barred prosecutions for treason that various Congressmen wanted brought against Jefferson Davis and "his coconspirators," Cong. Globe, 39th Cong., 2d Sess., 279 (1866–1867) (comments of Rep. Lawrence). Radical Republicans such as Roscoe Conkling and Thaddeus Stevens, no friends of the South, opposed the bill because, in their minds, it proposed an *"ex post facto* law," *id.*, at 68 (comments of Rep. Conkling), and threatened an injustice tantamount to "judicial murder," *id.*, at 69 (comments of Rep. Stevens). In this instance, Con-

gress ultimately passed a law extending *unexpired* limitations periods, ch. 236, 15 Stat. 183—a tailored approach to extending limitations periods that has also been taken in modern statutes, *e. g.,* 18 U. S. C. § 3293 (notes on effective date of 1990 amendment and effect of 1989 amendment); Cal. Penal Code Ann. § 805.5 (West Supp. 2003).

Further, Congressmen such as Conkling were not the only ones who believed that laws reviving time-barred prosecutions are *ex post facto.* That view was echoed in roughly contemporaneous opinions by State Supreme Courts. *E. g., State* v. *Sneed,* 25 Tex. Supp. 66, 67 (1860); *Moore,* 43 N. J. L., at 216–217. Cf. *State* v. *Keith,* 63 N. C. 140, 145 (1869) (A State's repeal of an amnesty was "substantially an *ex post facto* law"). Courts, with apparent unanimity until California's decision in *Frazer,* have continued to state such views, and, when necessary, so to hold. *E. g., People ex rel. Reibman* v. *Warden,* 242 App. Div. 282, 285, 275 N. Y. S. 59, 62 (1934); *United States* v. *Fraidin,* 63 F. Supp. 271, 276 (Md. 1945); *People* v. *Shedd,* 702 P. 2d 267, 268 (Colo. 1985) (en banc) *(per curiam); State* v. *Hodgson,* 108 Wash. 2d 662, 667–669, 740 P. 2d 848, 851–852 (1987) (en banc), cert. denied *sub nom. Fied* v. *Washington,* 485 U. S. 938 (1988); *Commonwealth* v. *Rocheleau,* 404 Mass. 129, 130–131, 533 N. E. 2d 1333, 1334 (1989); *State* v. *Nunn,* 244 Kan. 207, 218, 768 P. 2d 268, 277–278 (1989); *State* v. *O'Neill,* 118 Idaho 244, 247, 796 P. 2d 121, 124 (1990); *State* v. *Hirsch,* 245 Neb. 31, 39–40, 511 N. W. 2d 69, 76 (1994); *State* v. *Schultzen,* 522 N. W. 2d 833, 835 (Iowa 1994); *State* v. *Comeau,* 142 N. H. 84, 88, 697 A. 2d 497, 500 (1997) (citing *State* v. *Hamel,* 138 N. H. 392, 395–396, 643 A. 2d 953, 955–956 (1994)); *Santiago* v. *Commonwealth,* 428 Mass. 39, 42, 697 N. E. 2d 979, 981, cert. denied, 525 U. S. 1003 (1998). Cf. *Thompson* v. *State,* 54 Miss. 740, 743 (1877) (stating, without specifying further grounds, that a new law could not take away a vested statute-of-limitations defense); *State* v. *Cookman,* 127 Ore. App. 283, 289, 873 P. 2d 335, 338 (1994) (holding that a law resurrecting a time-barred crimi-

nal case "violates the Due Process Clause"), aff'd on state-law grounds, 324 Ore. 19, 920 P. 2d 1086 (1996); *Commonwealth* v. *Guimento*, 341 Pa. Super. 95, 97–98, 491 A. 2d 166, 167–168 (1985) (enforcing a state ban on *ex post facto* laws apparently equivalent to the federal prohibition); *People* v. *Chesebro*, 185 Mich. App. 412, 416, 463 N. W. 2d 134, 135–136 (1990) (reciting "the general rule" that, "'where a complete defense has arisen under [a statute of limitations], it cannot be taken away by a subsequent repeal thereof'").

Even where courts have upheld extensions of *unexpired* statutes of limitations (extensions that our holding today does not affect, see *supra*, at 613), they have consistently distinguished situations where limitations periods have *expired*. Further, they have often done so by saying that extension of existing limitations periods is not *ex post facto* "provided," "so long as," "because," or "if" the prior limitations periods have not expired—a manner of speaking that suggests a presumption that revival of time-barred criminal cases is *not* allowed. *E. g., United States* v. *Madia*, 955 F. 2d 538, 540 (CA8 1992) ("'provided'"); *United States* v. *Richardson*, 512 F. 2d 105, 106 (CA3 1975) ("provided"); *People* v. *Anderson*, 53 Ill. 2d 437, 440, 292 N. E. 2d 364, 366 (1973) ("so long as"); *United States* v. *Haug*, 21 F. R. D. 22, 25 (ND Ohio 1957) ("so long as"), aff'd, 274 F. 2d 885 (CA6 1960), cert. denied, 365 U. S. 811 (1961); *United States* v. *Kurzenknabe*, 136 F. Supp. 17, 23 (NJ 1955) ("so long as"); *State* v. *Duffy*, 300 Mont. 381, 390, 6 P. 3d 453, 460 (2000) ("because"); *State* v. *Davenport*, 536 N. W. 2d 686, 688 (N. D. 1995) ("because"); *Andrews* v. *State*, 392 So. 2d 270, 271 (Fla. App. 1980) ("if"), review denied, 399 So. 2d 1145 (Fla. 1981). See, *e. g., Shedd, supra*, at 268 (citing *Richardson, supra*, and *Andrews, supra*, as directly supporting a conclusion that a law reviving time-barred offenses is *ex post facto*). Cf. *Commonwealth* v. *Duffy*, 96 Pa. 506, 514 (1881) ("[I]n any case where a right to acquittal has not been absolutely acquired by the completion of the period of limitation, that period

is subject to enlargement or repeal without being obnoxious to the constitutional prohibition against *ex post facto* laws").

Given the apparent unanimity of pre-*Frazer* case law, legal scholars have long had reason to believe this matter settled. As early as 1887, Henry Black reported that, although "not at all numerous," the "cases upon this point . . . unmistakably point to the conclusion that such an act would be *ex post facto* in the strict sense, and void." Constitutional Prohibitions § 235, at 297. Even earlier, in 1874, Francis Wharton supported this conclusion by emphasizing the historic role of statutes of limitations as "acts of grace or oblivion, and not of process," "extinguish[ing] all future prosecution" and making an offense unable to "be again called into existence at the caprice of the prince." 1 Criminal Law § 444a, at 347–348, n. *b*. More modern commentators—reporting on the same and subsequent cases—have come to the same conclusion. *E. g.*, 21 Am. Jur. 2d, Criminal Law § 294, pp. 349–350 (1998 and Supp. 2002); 16A C. J. S., Constitutional Law § 420, p. 372 (1984 and Supp. 2002); 4 LaFave, Israel, & King, Criminal Procedure § 18.5(a), at 718, n. 6; 2 C. Antieau & W. Rich, Modern Constitutional Law § 38.11, p. 445 (2d ed. 1997); Adlestein, Conflict of the Criminal Statute of Limitations with Lesser Offenses at Trial, 37 Wm. & Mary L. Rev. 199, 246 (1995); C. Corman, Limitation of Actions § 1.6, p. 35 (1993 Supp.); Black, Statutes of Limitations and the Ex Post Facto Clauses, 26 Ky. L. J. 42 (1937); Black, American Constitutional Law § 266, at 700. Cf. H. Wood, Limitation of Actions § 13, p. 43 (3d ed. 1901) (The State "may be said" to be "estopped from prosecuting"). Likewise, with respect to the closely related case of a law repealing an amnesty—a case not distinguished by the dissent—William Wade concluded early on that "[s]uch an act would be as clearly in contravention of the inhibition of *ex post facto* laws as though it undertook to annex criminality to an act innocent when done." Operation and Construction of Retroactive Laws

§ 286, p. 339 (1880). But cf. *post,* at 638–639 (KENNEDY, J., dissenting).

This Court itself has not previously spoken decisively on this matter. On the one hand, it has clearly stated that the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired. *Brown* v. *Walker,* 161 U. S. 591, 597–598 (1896). And that rule may suggest that the expiration of a statute of limitations is irrevocable, for otherwise the passage of time would not have eliminated fear of prosecution.

On the other hand, in *Stewart* v. *Kahn,* 11 Wall. 493, 503–504 (1871), this Court upheld a statute, enacted during the Civil War, that retroactively tolled *all* civil and criminal limitations for periods during which the war had made service of process impossible or courts inaccessible. *Stewart,* however, involved a civil, not a criminal, limitations statute. *Id.,* at 500–501. Significantly, in reviewing this civil case, the Court upheld the statute as an exercise of Congress' war powers, *id.,* at 507, without explicit consideration of any potential collision with the *Ex Post Facto* Clause. Moreover, the Court already had held, independent of Congress' Act, that statutes of limitations were tolled for "the time during which the courts in the States lately in rebellion were closed to the citizens of the loyal States . . . ." *Id.,* at 503; see also *Hanger* v. *Abbott,* 6 Wall. 532, 539–542 (1868). Hence, the Court could have seen the relevant statute as ratifying a pre-existing expectation of tolling due to wartime exigencies, rather than as extending limitations periods that had truly expired. See *id.,* at 541; see also *Stewart, supra,* at 507. In our view, *Stewart* therefore no more dictates the outcome here than does seemingly contrary precedent regarding the Fifth Amendment privilege.

Instead, we believe that the outcome of this case is determined by the nature of the harms that California's law creates, by the fact that the law falls within Justice Chase's second category as Chase understood that category, and by

a long line of authority holding that a law of this type violates the *Ex Post Facto* Clause.

## III

In a prodigious display of legal and historical textual research, the dissent finely parses cases that offer us support, see *post,* at 633–637; shows appreciation for 19th-century dissident commentary, see *post,* at 638–639; discusses in depth its understanding of late 17th-century and early 18th-century parliamentary history, *post,* at 642–649; and does its best to drive a linguistic wedge between Justice Chase's alternative descriptions of categories of *ex post facto* laws, *post,* at 640–641. All to what end? The dissent undertakes this Herculean effort to prove that it is *not* unfair, in any constitutionally relevant sense, to prosecute a man for crimes committed 25 to 42 years earlier when nearly a generation has passed since the law granted him an effective amnesty. Cf. *post,* at 649–653.

We disagree strongly with the dissent's ultimate conclusion about the fairness of resurrecting a long-dead prosecution. See *infra,* at 630–632. Rather, like Judge Learned Hand, we believe that this retroactive application of a later-enacted law is unfair. And, like most other judges who have addressed this issue, see *supra,* at 617–618, we find the words *"ex post facto"* applicable to describe this kind of unfairness. Indeed, given the close fit between laws that work this kind of unfairness and the Constitution's concern with *ex post facto* laws, we might well conclude that California's law falls within the scope of the Constitution's interdiction even were the dissent's historical and precedent-related criticisms better founded than they are.

We need not examine that possibility here, however, because the dissent's reading of the relevant history and precedent raises far too many problems to serve as a foundation for the reading of *"ex post facto"* that it proposes. In our view, that reading is too narrow; it is unsupported by prec-

edent; and it would deny liberty where the Constitution gives protection.

## A

In the dissent's view, Chase's historical examples show that *"Calder's* second category concerns only laws" that both (1) "subjec[t] the offender to increased punishment" and (2) do so by *"chang[ing] the nature of an offense* to make it greater than it was at the time of commission." *Post,* at 642 (emphasis added). The dissent does not explain what it means by "chang[ing] the nature of an offense," but we must assume (from the fact that this language comes in a dissent) that it means something beyond attaching otherwise unavailable punishment and requires, in addition, some form of re-characterization of the crime. After all, the dissent seeks to show through its discussion of the relevant historical examples that a new law subjecting to punishment a person not then legally subject to punishment does not fall within the second category *unless* the new law somehow changes the kind of crime that was previously at issue.

The dissent's discussion of the historical examples suffers from several problems. First, it raises problems of historical *accuracy.* In order to show the occurrence of a change in the kind or nature of the crime, the dissent argues that Parliament's effort to banish the Earl of Clarendon amounted to an effort "to elevate criminal behavior of lower magnitude to the level of treason." *Post,* at 643. The dissent supports this argument with a claim that "the allegations [against Clarendon] could not support a charge of treason." *Ibid.* Historians, however, appear to have taken a different view. But cf. *post,* at 646. In their view, at least one charge against Clarendon *did* amount to treason.

Clarendon was charged with "betraying his majesty's secret counsels to his enemies during the war." *Edward Earl of Clarendon's Trial,* 6 How. St. Tr. 292, 350 (1667) (hereinafter *Clarendon's Trial*). In the words of one historian, this charge "undoubtedly contained treasonous matter."

Roberts, The Impeachment of the Earl of Clarendon, 13 Camb. Hist. J. 1, 13 (1957) (hereinafter Roberts, Impeachment); accord, G. Miller, Edward Hyde, Earl of Clarendon 21–22 (1983); 10 Dictionary of National Biography 383 (L. Stephen & S. Lee eds. reprint 1922). See also Roberts, The Law of Impeachment in Stuart England: A Reply to Raoul Berger, 84 Yale L. J. 1419, 1426 (1975); R. Berger, Impeachment: The Constitutional Problems 45, n. 193 (1974) (acknowledging and not contradicting the historian Henry Hallam's conclusion that " 'one of the articles did actually contain an unquestionable treason' "). And it was on the basis of this specific charge—a charge of conduct that amounted to treason—that the House of Commons (which had previously refused to impeach Clarendon on other charges that did not amount to treason) "voted to impeach Clarendon for high treason." Roberts, Impeachment 13; accord, Clarendon's Trial 350–351.

The House of Lords initially thought that the Commons had failed to provide sufficient evidence because it failed to provide "special articles" laying out "particulars to prove it." Roberts, Impeachment 14. The Lords and Commons deadlocked over whether a "general charge" was sufficient. Ibid. See also Clarendon's Trial 351–374. But Clarendon fled, thereby providing proof of guilt. 10 Dictionary of National Biography, supra, at 383; see also Clarendon's Trial 389–390; 2 H. Hallam, Constitutional History of England: From the Accession of Henry VII to the Death of George II, p. 373 (8th ed. 1855). See also Berger, supra, at 44–45, and n. 189. The Lords and Commons then agreed to banish Clarendon. The Act of banishment—the only item in this complicated history explicitly cited by Chase—explained that Clarendon was being banished because he had "been impeached by the Commons . . . of Treason and other misdemeanours" and had "fled whereby Justice cannot be done upon him according to his demerit." 19 & 20 Car. II, c. 2 (1667–1668) (reprint 1963).

In sum, Clarendon's case involved Parliament's punishment of an individual who was *charged* before Parliament *with treason and* satisfactorily *proved to have committed treason,* but whom Parliament punished by imposing "banishment" in circumstances where the party was *not, in "the ordinary course of law," liable to any "banishment."* See *supra,* at 614. Indeed, because Clarendon had fled the country, it had become impossible to hold a proper trial to subject Clarendon to punishment through "ordinary" proceedings. See 19 & 20 Car. II, c. 2; *Clarendon's Trial* 385–386. To repeat, the example of Clarendon's banishment is an example of an individual's being punished through legislation that subjected him to punishment otherwise unavailable, to any degree, through "the ordinary course of law"—just as Chase and his predecessor Wooddeson said. *Calder,* 3 Dall., at 389, and n. ‡; 2 Wooddeson, Systematical View 638. See also *Carmell,* 529 U. S., at 523, n. 11.

A second problem that the dissent's account raises is one of historical *completeness.* That account does not explain how the second relevant example—the banishment of the Bishop of Atterbury—can count as an example of a recharacterization of a pre-existing crime. The dissent concedes that Atterbury was charged with conduct constituting a "conspiracy to depose George I." *Post,* at 647. It ought then to note (but it does not note) that, like the charge of " 'betraying his majesty's secret counsels,' " *supra,* at 622, this charge *was* recognized as a charge of treason, see 2 J. Stephen, A History of the Criminal Law of England 266–267 (1883). As the dissent claims, the evidence upon which Parliament based its decision to banish may have been "meager," and the punishment may even have been greater than some expected. *Post,* at 647. But the relevant point is that Parliament did not recharacterize the Bishop's crime. Rather, through extraordinary proceedings that concluded with a punishment that only the legislature could impose,

Parliament aggravated a predefined crime by imposing a punishment that courts could not have imposed in "the ordinary course."

Third, the dissent's account raises a problem of *vagueness*. The dissent describes Justice Chase's alternative description of the second category as "shed[ding] light on the meaning" of the category, *post*, at 641, and describes the historical references that accompany Chase's alternative description as "illustrative examples," *post*, at 649. But the question is would the dissent apply the term *ex post facto* to laws that fall within the alternative description—or would it not? If not, how does it reconcile its view with *Carmell?* See 529 U. S., at 522, n. 9; see also *id.*, at 523 (Wooddeson's categories "correlate precisely to *Calder*'s four categories"). If so, how does it explain the fact that the alternative description nowhere says anything about recharacterizing, or "changing the nature," of a crime?

In our view, the key to the Atterbury and Clarendon examples lies not in any kind of recharacterization, or the like, but in the fact that Atterbury and Clarendon suffered the "same sentence"—"*banishment.*" 2 Wooddeson, Systematical View 638; see also *Calder, supra*, at 389, n. ‡ (using the word "banishment" to describe both examples). As we have argued, *supra*, at 614, Parliament aggravated the crimes at issue by imposing an otherwise unavailable punishment—namely, banishment—which was, according to Wooddeson, a "forfeiture or disability, not incurred in the ordinary course of law," 2 Systematical View 638.

Fourth, the dissent's initial account suffers from a technical problem of *redundancy*. Were the second category always to involve the recharacterization of an offense in a way that subjects it to greater punishment, see *post*, at 642, the second category would be redundant. Any law falling within it would also necessarily fall within the third category, which already encompasses "'*[e]very* law that . . . inflicts a greater punishment,'" *supra*, at 612 (emphasis added).

Fifth, the dissent's historical account raises problems of *pertinence.* For one thing, to the extent that we are construing the scope of the *Calder* categories, we are trying not to investigate precisely what happened during the trials of Clarendon and Atterbury, but to determine how, several decades later, an 18th-century legal commentator and an 18th-century American judge who relied on that commentator—and, by extension, the Framers themselves—likely understood the scope of the words *"ex post facto."* Hence, the dissent's account seems of little relevance once we recognize that:

(1) When Justice Chase set forth his alternative language for the second category (the language that the historical examples are meant to illuminate), he said nothing about recharacterizing crimes, *Calder,* 3 Dall., at 389;

(2) When Chase speaks of laws "declaring acts to be treason, which were *not* treason, when committed," *ibid.,* he uses this language for his alternative description of *first category* laws, and *not second category* laws, *supra,* at 612; and

(3) Wooddeson says nothing about recharacterizing crimes and instead uses the Clarendon and Atterbury examples to illustrate laws that *"principally affect the punishment,* making therein some innovation, or creating some forfeiture or disability, not incurred in the ordinary course of law," 2 Systematical View 638 (some emphasis added).

Of course, we do not know whether Chase and Wooddeson, in using such language, had statutes of limitations specifically in mind. We know only that their descriptions of *ex post facto* laws and the relevant historical examples indicate an *ex post facto* category broad enough to include retroactive changes in, and applications of, those statutes. And we

know that those descriptions fit this case—the dissent's historical exegesis notwithstanding.

More importantly, even were we to accept the dissent's view that Chase's second category examples involved some kind of recharacterization of criminal behavior (which they did not), why would recharacterization be the *ex post facto* touchstone? Why, in a case where (a) application of a previously inapplicable punishment and (b) recharacterization (or "changing the nature") of criminal behavior do not come hand in hand, should the absence of the latter make a critical difference? After all, the presence of a recharacterization without new punishment works no harm. But the presence of the new punishment without recharacterization works *all* the harm. Indeed, it works retroactive harm—a circumstance relevant to the applicability of a constitutional provision aimed at preventing unfair retroactive laws. Perhaps that is why Justice Chase's alternative description—which, like Wooddeson's, speaks of laws "affect[ing] *the punishment*," *ibid.*—does not mention recharacterization or the like.

B

The dissent believes that our discussion of the case law is "less persuasive than it may appear at a first glance." *Post*, at 633. The dissent says that this case law is "deficient," and that we rely on an "inapposite" case and other cases that "flatly contradict" the "principles" on which we rely. *Post*, at 634, 635.

Having reviewed the relevant cases and commentary, we continue to believe that our characterizations are accurate. We say that courts, "with apparent unanimity until California's decision in *Frazer*, have continued to state" that "laws reviving time-barred prosecutions are *ex post facto*" and, "when necessary, so to hold." *Supra*, at 617. That statement is accurate. The dissent refers to no case, outside of California, that has held, or even suggested, anything to the contrary.

Of course, one might claim that the judges who wrote the cited opinions did not consider the matter as thoroughly as has the dissent or used precisely the same kind of reasoning. The dissent makes this kind of argument in its discussion of the old New Jersey case, *Moore* v. *State*, 43 N. J. L. 203 (1881)—a case that we believe supports our view. The dissent says that the *Moore* court "expressly stated that a statute reviving an expired limitations period 'is not covered by any of [Justice Chase's] classes.'" *Post*, at 635. And the dissent draws from this language the conclusion that *Moore* "flatly contradict[s]" our views. *Post*, at 635.

The dissent, however, has taken the language that it quotes out of context. In context, the court's statement reflects a conclusion that the language of Justice Chase's *first* description of the categories (which *Moore* used the word "classes" to describe) does not fit cases in which a State revives time-barred prosecutions. The *Moore* court immediately adds, however, that Chase's *alternative* description of second category laws *does* fit this case. Indeed, it *"easily embraces"* a statute that, like the statute here, retroactively extends an expired statute of limitations and *"exactly describes* [its] operation." 43 N. J. L., at 216–217 (emphasis added). Had the New Jersey court had the benefit of *Carmell*, 529 U. S., at 522–524, and n. 9, or perhaps even of the dissent itself, *post*, at 641, would it not have recognized Chase's alternative description as an authoritative account of elements of Chase's "classes"? Would it then not have withdrawn its earlier statement, which the dissent quotes? Would it not have simply held that the statute did fall within the second category? Our reading of the case leads us to answer these questions affirmatively, but we leave the interested reader to examine the case and draw his or her own conclusions.

The dissent draws special attention to another case, *State* v. *Sneed*, 25 Tex. Supp. 66 (1860), arguing that it is "inapposite" because it "avoided the issue" whether a law was

*ex post facto* "by holding that the statute was not meant to apply retroactively." *Post,* at 634. Here is the court's analysis, virtually in full:

> "In this case the bar of the statute of limitations of one year was completed before the Code went into operation . . . . The state having neglected to prosecute within the time prescribed for its own action, lost the right to prosecute the suit. To give an Act of the Legislature, passed after such loss, the effect of reviving the right of action in the State, would give it an operation *ex post facto,* which we cannot suppose the Legislature intended." 25 Tex. Supp., at 67.

The reader can make up his own mind.

Neither can we accept the dissent's view that Judge Learned Hand's like-minded comments in *Falter* were "unsupported," *post,* at 637. In fact, Judge Hand's comments had support in pre-existing case law, commentary, and published legislative debates, *supra,* at 616–620, and Hand's opinion specifically cited *Moore* and two other early cases, *Commonwealth* v. *Duffy,* 96 Pa. 506 (1880), and *People* v. *Buckner,* 281 Ill. 340, 117 N. E. 1023 (1917). *Falter,* 23 F. 2d, at 425.

We add that, whatever the exact counts of categories of cases that we cite, cf. *post,* at 633, it is not surprising that most of these cases involve dicta, while only a handful involve clear holdings. Where the law has long been accepted as clearly settled, few cases are likely to arise, and cases that do arise most likely involve bordering areas of law, such as new limitations statutes enacted *prior* to expiration of pre-existing limitations periods. Consistent with this expectation, one commentator noted in 1993 that the question whether to give retroactive effect to the extension of *unexpired* limitations periods had "become timely due to state legislature amendments during the early 1980s that lengthen the limitation period for the crimes of rape and sexual intercourse with a child." Corman, Limitation of Actions § 1.6,

at 36. The law at issue today represents a kind of extreme variant that, given the legal consensus of unconstitutionality, has not likely been often enacted in our Nation's history. Cf. 1 J. Bishop, Criminal Law § 219a, p. 127 (rev. 4th ed. 1868) (declining to answer whether a law reviving time-barred prosecutions was *ex post facto* in part because "it is not likely to come before the courts").

Neither should it be surprising if the reasoning in a string of cases stretching back over nearly 150 years is not perfectly consistent with modern conceptions of how legal analysis should proceed. After all, *Beazell* v. *Ohio*, 269 U. S. 167 (1925), an opinion relied on by the dissent, *post*, at 640, is itself vulnerable to criticism that its "method of analysis is foreclosed by this Court's precedents," *post*, at 637. See *Collins*, 497 U. S., at 45–46. In assessing the case law, we find the essential fact to be the unanimity of judicial views that the kind of statute before us is *ex post facto*. See *supra*, at 617–619.

The situation is similar with respect to commentators. Here, the essential fact is that, over a span of well over a century, commentators have come to the same conclusion, and have done so with virtual unanimity. See *supra*, at 619–620. We say "virtual," for the dissent identifies one commentator who did not, namely, Joel Bishop—the same commentator relied on 122 years ago by the dissent in *Moore*, *supra*, at 240. The *Moore* majority rejected Bishop's conclusion. So did other contemporary courts and commentators. *Supra*, at 617–620. We do the same.

### C

The dissent says it is a "fallacy" to apply the label " 'unfair and dishonest' " to this statute, a law that revives long-dead prosecutions. *Post*, at 650. The dissent supports this conclusion with three arguments. First, it suggests that "retroactive extension of unexpired statutes of limitations" is no less unfair. *Ibid.* Second, the dissent refers to the small

likelihood that "criminals keep calendars" to mark the expiration of limitations periods, and it mocks the possibility that revival "destroys a reliance interest." *Ibid.* Third, the dissent emphasizes the harm that child molestation causes, a harm that "will plague the victim for a lifetime," and stresses the need to convict those who abuse children. *Post,* at 651.

In making the first argument, the dissent reverses field, abandoning its historical literalism to appeal to practical consequences. But history, case law, and constitutional purposes *all* are relevant. At a minimum, the first two of these adequately explain the difference between expired and unexpired statutes of limitations, and Chase's alternative description of second category laws itself supports such a distinction. See *supra,* at 613–614, 618–619.

In making its second argument, which denies the existence of significant reliance interests, the dissent ignores the potentially lengthy period of time (in this case, 22 years) during which the accused lacked notice that he might be prosecuted and during which he was unaware, for example, of any need to preserve evidence of innocence. See *supra,* at 609–610. Memories fade, and witnesses can die or disappear. See *supra,* at 615–616. Such problems can plague child abuse cases, where recollection after so many years may be uncertain, and "recovered" memories faulty, but may nonetheless lead to prosecutions that destroy families. See, *e. g.,* Holdsworth, Is It Repressed Memory with Delayed Recall or Is It False Memory Syndrome? The Controversy and Its Potential Legal Implications, 22 Law & Psychol. Rev. 103, 103–104 (1998). Regardless, a constitutional principle must apply not only in child abuse cases, but in every criminal case. And, insofar as we can tell, the dissent's principle would permit the State to revive a prosecution for *any* kind of crime without *any* temporal limitation. Thus, in the criminal context, the dissent goes beyond our prior statements of what is constitutionally permissible even in the

analogous civil context. *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304, 312, n. 8, 315–316 (1945) (acknowledging that extension of even an expired *civil* limitations period can unconstitutionally infringe upon a "vested right"); *William Danzer & Co.* v. *Gulf & Ship Island R. Co.,* 268 U. S. 633, 637 (1925) (holding the same). But see *post,* at 638, 653. It is difficult to believe that the Constitution grants greater protection from unfair retroactivity to property than to human liberty.

As to the dissent's third argument, we agree that the State's interest in prosecuting child abuse cases is an important one. But there is also a predominating constitutional interest in forbidding the State to revive a long-forbidden prosecution. And to hold that such a law is *ex post facto* does not prevent the State from extending time limits for the prosecution of future offenses, or for prosecutions not yet time barred.

In sum, California's law subjects an individual such as Stogner to prosecution long after the State has, in effect, granted an amnesty, telling him that he is "at liberty to return to his country . . . and that from henceforth he may cease to preserve the proofs of his innocence," Wharton, Criminal Pleading and Practice § 316, at 210. See also *Moore,* 43 N. J. L., at 223–224. It retroactively withdraws a complete defense to prosecution after it has already attached, and it does so in a manner that allows the State to withdraw this defense at will and with respect to individuals already identified. See *supra,* at 611. "Unfair" seems to us a fair characterization.

## IV

The statute before us is unfairly retroactive as applied to Stogner. A long line of judicial authority supports characterization of this law as *ex post facto.* For the reasons stated, we believe the law falls within Justice Chase's second category of *ex post facto* laws. We conclude that a law enacted after expiration of a previously applicable limita-

tions period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution. The California court's judgment to the contrary is

*Reversed.*

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

California has enacted a retroactive extension of statutes of limitations for serious sexual offenses committed against minors. Cal. Penal Code Ann. § 803(g) (West Supp. 2003). The new period includes cases where the limitations period has expired before the effective date of the legislation. To invalidate the statute in the latter circumstance, the Court tries to force it into the second category of *Calder* v. *Bull,* 3 Dall. 386 (1798), which prohibits a retroactive law "'that *aggravates a crime,* or makes it *greater* than it was, when committed.'" *Ante,* at 612 (quoting *Calder, supra,* at 390 (emphasis in original)). These words, in my view, do not permit the Court's holding, but indeed foreclose it. A law which does not alter the definition of the crime but only revives prosecution does not make the crime "greater than it was, when committed." Until today, a plea in bar has not been thought to form any part of the definition of the offense.

To overcome this principle, the Court invokes "a long line of authority holding that a law of this type violates the *Ex Post Facto* Clause." *Ante,* at 621. The Court's list of precedents, *ante,* at 617–619, is less persuasive than it may appear at a first glance. Of the 22 cases cited by the Court, only 4 had to decide whether a revival of expired prosecutions was constitutional. See *Moore* v. *State,* 43 N. J. L. 203, 216–217 (1881); *United States* v. *Fraidin,* 63 F. Supp. 271, 276 (Md. 1945); *People* v. *Shedd,* 702 P. 2d 267, 268 (Colo. 1985) (en banc) *(per curiam); Commonwealth* v. *Rocheleau,* 404 Mass. 129, 130–131, 533 N. E. 2d 1333, 1334 (1989), cited *ante,* at 617. These four cases—which are the only cases that are relevant—will be discussed in due course.

·The case of *State* v. *Sneed,* 25 Tex. Supp. 66, 67 (1860), cited *ante,* at 617, is inapposite. There, the court avoided the issue by holding that the statute was not meant to apply retroactively. Interpreting the statute so as to avoid invalidation on constitutional grounds, *Sneed* did not pass on the merits. Even if the court addressed the merits, its cursory paragraph-long opinion, reproduced by the majority in its entirety, *ante,* at 629, contains no reference to Justice Chase's classification, nor indeed any analysis whatsoever. This unreasoned opinion scarcely supports the majority's novel interpretation of *Calder's* second category.

In the remaining 17 cases, the question was not presented. As the Court itself concedes, eight of these cases considered only extensions of unexpired statutes of limitations, and upheld them. *Ante,* at 618. The Court does not mention that nine other cases have done so as well. See *People ex rel. Reibman* v. *Warden,* 242 App. Div. 282, 275 N. Y. S. 59 (1934); *State* v. *Hodgson,* 108 Wash. 2d 662, 740 P. 2d 848 (1987) (en banc); *State* v. *Nunn,* 244 Kan. 207, 768 P. 2d 268 (1989); *State* v. *O'Neill,* 118 Idaho 244, 796 P. 2d 121 (1990); *State* v. *Schultzen,* 522 N. W. 2d 833 (Iowa 1994); *State* v. *Comeau,* 142 N. H. 84, 697 A. 2d 497 (1997); *State* v. *Hamel,* 138 N. H. 392, 643 A. 2d 953 (1994); *Santiago* v. *Commonwealth,* 428 Mass. 39, 697 N. E. 2d 979 (1998), cited *ante,* at 617. Because these cases did not need to decide whether the *Ex Post Facto* Clause would bar the extension of expired limitations periods, the question did not receive the same amount of attention as if the courts were required to dispose of the issue.

The case law compiled by the Court is deficient, furthermore, at a more fundamental level. Our precedents hold that the reach of the *Ex Post Facto* Clause is strictly limited to the precise formulation of the *Calder* categories. We have made it clear that these categories provide "an exclusive definition of *ex post facto* laws," *Collins* v. *Youngblood,* 497 U. S. 37, 42 (1990), and have admonished that it is

"a mistake to stray *beyond Calder*'s four categories," *Carmell* v. *Texas*, 529 U. S. 513, 539 (2000). Justice Chase himself stressed that the categories must be construed with caution to avoid any unnecessary extension: "I am under a necessity to give a *construction*, or explanation of the words, '*ex post facto law*,' because they have not any certain meaning attached to them. But I will not go farther than I feel myself bound to do; and if I ever exercise the jurisdiction I will not decide *any law to be void, but in a very clear case.*" 3 Dall., at 395.

The Court seems to recognize these principles, *ante*, at 611–612, but then relies on cases which flatly contradict them. The opinion of the New Jersey's Court of Errors and Appeals in *Moore* v. *State, supra,* on which the Court places special emphasis, see *ante*, at 613, 617, 628, 630, 632, expressly stated that a statute reviving an expired limitations period "is not covered by any of [Justice Chase's] classes." 43 N. J. L., at 216. The *Moore* court made a fleeting mention that the statute might fall within Chase's fourth category, but immediately dismissed this line of inquiry. Instead, it proceeded to "[l]oo[k] away from his classification to what he states to have been the motive for and principle sustaining the edict." *Ibid.* As *Collins* and *Carmell* explained, this expansive approach to the *Ex Post Facto* Clause is contrary to *Calder*'s admonition that its categories must be followed with care.

The majority's lengthy defense of *Moore*'s legitimacy, *ante*, at 628, exposes the weaknesses both of that case and of the Court's opinion. The majority argues *Moore*'s statement that the statute was not covered by Justice Chase's categories referred only to the principal description of these categories, but not to the alternative one the Court now seeks to embrace. The view that a statute not covered by Justice Chase's main formulations—the only formulations our cases have treated as authoritative—may still be *ex post facto* if it falls within his historical examples is a view no court until

today has endorsed. The *Moore* court was no exception. When it held that the state statute was "not covered by any of [Justice Chase's] classes," *Moore* made clear it was looking beyond the language of the *Calder* categories: "Judge Chase did not consider his classes as exhaustive," and so "a statute substantially imposing punishment for a previous act which, without the statute, would not be so punishable, is an *ex post facto* law, although it may not be included in the letter of Judge Chase's rules." 43 N. J. L., at 216, 220. The point was further emphasized by the separate opinion of Chancellor Runyon, a member of the one-judge *Moore* majority that invalidated the law as *ex post facto:* "[W]here the enactment, in whatever guise legislative ingenuity or subtlety may present it, inflicts the substantial injury, and does the essential wrong which the constitution sought to guard against, a true interpretation will hold it to be within the prohibition." *Id.*, at 226. The references to "substantia[l] imposi[tion of] punishment" and "substantial injury" are reminiscent of the references to "substantial protections" and "substantial personal rights" used to enlarge the scope of the *Ex Post Facto* Clause and disapproved of in *Collins.* 497 U. S., at 46. By endorsing *Moore*, the majority seeks to resurrect this rejected reasoning here.

The other precedents the Court invokes—both the cases where extension of expired statutes of limitations was at issue and the cases which merely opined on the question in dicta—have the same flaw. The misconception causing it arises from Judge Learned Hand's dictum, mentioned while holding that an extension of an unexpired statute of limitations is not *ex post facto*, that if the statute had expired there would be a violation. *Falter* v. *United States*, 23 F. 2d 420, 425 (CA2 1928). Judge Hand based this distinction on a citation of the faulty decision in *Moore* and on his belief that whether an extension of a limitations period is *ex post facto* "turns upon how much violence is done to our instinctive feelings of justice and fair play." *Falter, supra*, at 425–426.

The Court's opinion is premised on the same approach. It relies on Judge Hand for the proposition that an extension of expired limitations periods "'seems to most of us unfair and dishonest.'" *Ante,* at 611 (quoting *Falter, supra,* at 426). In previous cases, however, the Court has explained that this conception of our *ex post facto* jurisprudence is incorrect: "[W]hile the principle of unfairness helps explain and shape the Clause's scope, it is not a doctrine unto itself, invalidating laws under the *Ex Post Facto* Clause by its own force." *Carmell, supra,* at 533, n. 23 (citing *W. S. Kirkpatrick & Co.* v. *Environmental Tectonics Corp., Int'l,* 493 U. S. 400, 409 (1990)).

It was the unsupported Hand observation that formed the rationale applied by many of the cases the Court cites, including all the post-*Moore* cases where expired limitations periods were at issue. See *Fraidin,* 63 F. Supp., at 276 (relying on *Falter* and containing no discussion of the *Calder* categories); *Shedd,* 702 P. 2d, at 268 (same); *Hodgson,* 108 Wash. 2d, at 667–668, 740 P. 2d, at 851 (relying on, and quoting from, *Falter*); *Rocheleau,* 404 Mass., at 130, 533 N. E. 2d, at 1334 (containing no *Calder* analysis but relying instead on its earlier decision in *Commonwealth* v. *Bargeron,* 402 Mass. 589, 524 N. E. 2d 829 (1988), which in turn was based on *Falter*); *O'Neill,* 118 Idaho, at 246, 796 P. 2d, at 123 (citing *Falter* and supplying no analysis of its own); *State* v. *Hirsch,* 245 Neb. 31, 39, 511 N. W. 2d 69, 76 (1994) (relying on *Falter*); *Hamel,* 138 N. H., at 395, 643 A. 2d, at 955 (same). Since these cases applied the methodology our Court has disavowed, they provide the majority with scant support. None of them even discussed the issue in terms of *Calder*'s second category, much less construed that category in the manner today's decision improperly proposes. The flaw of these cases is not, as the majority argues, that they are "not perfectly consistent with modern conceptions of how legal analysis should proceed," *ante,* at 630; the flaw is that their method of analysis is foreclosed by this Court's precedents.

The majority turns for help to a roster of commentators who concluded that revival of expired statutes of limitations is precluded by the *ex post facto* guarantee. See *ante*, at 619–620. Some of the commentators applied the same expansive approach we have declared impermissible in *Collins* and *Carmell*. Henry Black, on whose work the Court relies the most, see *ante*, at 613, 615, 619, openly acknowledged that the revival of expired statutes of limitations is not covered by any of the *Calder* categories. See Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts, and Against Retroactive and Ex Post Facto Laws § 227, p. 291 (1887). Black, moreover, relied on the example of the civil statutes of limitations, which he believed could not be revived. *Id.*, § 235, at 296–297. The Court's later case law has rendered this interpretation questionable. See, *e. g., Chase Securities Corp.* v. *Donaldson*, 325 U. S. 304, 314–316 (1945). Other commentators relied, often with no analysis, on the *Moore* and *Falter* line of cases, which were plagued by methodological infirmities since discovered. See authorities cited *ante*, at 619. None of these scholars explained their conclusion by reference to *Calder*'s second category.

There are scholars who have considered with care the meaning of that category; and they reached the conclusion stated in this dissent, not the conclusion embraced by the majority. In his treatise on retroactive legislation, William Wade defined the category as covering the law "which undertakes to aggravate a past offence, and make it greater than when committed, endeavors to bring it under some description of transgression against which heavier penalties or more severe punishments have been denounced: as, changing the character of an act which, when committed, was a misdemeanor, to a crime; or, declaring a previously committed offence, of one of the classes graduated, and designated by the number of its degree, to be of a higher degree than it was when committed." Operation and Construction of Retroac-

tive Laws §273, pp. 317–318 (1880). Joel Prentiss Bishop's work on statutory crimes concluded that a law reviving expired prosecution "is not within any of the recognized legal definitions of an *ex post facto* law." Commentaries on the Law of Statutory Crimes §266, p. 294 (rev. 3d ed. 1901). The author's explanation is an apt criticism of the Court's opinion: "The punishment which it renders possible, by forbidding the defense of lapse of time, is exactly what the law provided when 'the fact' transpired. No bending of language, no supplying of implied meanings, can, in natural reason, work out the contrary conclusion. . . . The running of the old statute had taken from the courts the right to proceed against the offender, leaving the violated law without its former remedy; but it had not obliterated the fact that the law forbade the act when it was done, or removed from the doer's mind his original consciousness of guilt." *Id.,* §266, at 294–295. In reaching his conclusion, Bishop considered, and rejected, the argument put forth by the *Moore* majority. Commentaries on the Law of Statutory Crimes, *supra,* §266, at 295, and n. 5. This rejection does not, as the majority believes, undermine Bishop's conclusion, see *ante,* at 630; given *Moore's* infirmities, it strengthens the validity of his interpretation.

This definition of *Calder's* second category is necessary for consistency with our accepted understanding of categories one and three. The first concerns laws declaring innocent acts to be a crime; the third prohibits retroactive increases in punishment. 3 Dall., at 390. The first three categories guard against the common problem of retroactive redefinition of conduct by criminalizing it (category one), enhancing its criminal character (category two), or increasing the applicable punishment (category three). The link between these categories was noted by Justice Paterson in *Calder* itself: "The enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or pen-

alty; and therefore they may be classed together." *Id.*, at 397.

The point is well illustrated in *Beazell* v. *Ohio*, 269 U. S. 167 (1925), whose formulation of the *Calder* categories we later described as "faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause." *Collins*, 497 U. S., at 43. *Beazell* involved a retroactively applied law providing for joint trials for most felonies, with separate trials allowed only when requested by one of the defendants or the prosecutor, and only with the leave of the court. 269 U. S., at 168–169. The prior law had provided for separate trials whenever a defendant so requested. *Id.*, at 168. Reviewing an *ex post facto* challenge to the new law, the Court noted that the first three *Calder* categories address "the criminal quality attributable to an act." 269 U. S., at 170. Applying this definition, the Court held the state statute did not violate the *Ex Post Facto* Clause because "[i]t does not deprive [the defendant] of any defense previously available, nor affect the criminal quality of the act charged. Nor does it change the legal definition of the offense or the punishment to be meted out." *Ibid.* In other words, the Ohio statute fell into none of the first three *Calder* categories. The second category, as the *Beazell* Court understood it, covered those retroactive statutes which "affect the criminal quality of the act charged [by] chang[ing] the legal definition of the offense." 269 U. S., at 170. The California statute challenged by petitioner changes only the timespan within which the action against him may be filed; it does not alter the criminal quality assigned to the offense.

The Court's opinion renders the second *Calder* category unlimited and the surrounding categories redundant. A law which violates the first *Calder* category would also violate the Court's conception of category two, because such a law would "inflic[t] punishments, where the party was not, by law, liable to any punishment." *Ante*, at 612 (emphasis deleted and internal quotation marks omitted). The majority

attempts to eliminate this redundancy by limiting its definition to instances where the conduct was criminal, yet if Justice Chase's alternative description of the second category is supposed to be definitive of its scope, *ante*, at 611, it would seem to strike broader than the Court's limiting construction. Similarly, a retroactive law increasing punishment in violation of the third category would also constitute an "innovation" for which, prior to the passage of the new law, the offender was not liable, *ante*, at 612, and so be prohibited under the Court's unbounded interpretation of category two. The Court's new definition not only distorts the original meaning of the second *Calder* category, but also threatens the coherence of the overall *ex post facto* scheme.

Realizing the inconsistency, the majority scarcely refers to the authoritative language Justice Chase used to describe the second category. Instead, the Court relies on what it terms Justice Chase's alternative description of that category, which speaks about laws which "'inflict[ed] punishments, where the party was not, by law, liable to any punishment.'" *Ante*, at 612 (emphasis deleted) (quoting *Calder*, 3 Dall., at 389). These words are not, strictly speaking, a description of the second category itself; they are a description of the category's historical origins. Justice Chase used them to refer to certain laws passed by the British Parliament which led the Founders to adopt the *Ex Post Facto* Clause; he did not intend them as a definitive description of the laws prohibited by that constitutional provision. *Ibid.* This description of a category's origins may, of course, shed light on the meaning of Justice Chase's principal formulation, which was meant to be definitive. The Court, however, uses Chase's alternative description as the independent operative definition of that category. None of our precedents, until today, based their holding on the language of Justice Chase's alternative description, certainly not in situations when the statute under review would not fit within the principal formulation.

The Court, in any event, misunderstands the alternative description. As our precedents have instructed, this description must be viewed in the context of the history of the British parliamentary enactments to which Justice Chase referred. *Ante*, at 614; cf. *Carmell*, 529 U. S., at 526–530 (examining the historical circumstances of the case of Sir John Fenwick, cited by Justice Chase as an example of the fourth *ex post facto* category, in order "[t]o better understand the type of law that falls within that category"). With respect to the second category, Justice Chase provided two examples: the banishments of Lord Clarendon in 1667 and of Bishop Francis Atterbury in 1723. *Calder, supra,* at 389, and n. ‡ (citing 19 Car. II, c. 10; 9 Geo. I, c. 17). A consideration of both historical episodes confirms that *Calder's* second category concerns only laws which change the nature of an offense to make it greater than it was at the time of commission, thereby subjecting the offender to increased punishment.

Justice Chase and, it can be presumed, the Founders were familiar with the parliamentary proceedings leading to the banishment of the Earl of Clarendon. Clarendon, former Lord Chancellor and principal advisor to Charles II, was impeached by the House of Commons on charges of treason. *Edward Earl of Clarendon's Trial,* 6 How. St. Tr. 292, 330–334, 350 (1667) (hereinafter *Clarendon's Trial*); G. Miller, Edward Hyde, Earl of Clarendon 20–21 (1983). The House of Lords, however, refused to commit Clarendon to trial, finding the allegations not cognizable as treason under the law. *Clarendon's Trial* 358, 367. With the two Houses deadlocked, Clarendon left the country, an exit wise for his safety, perhaps, but not for his cause. For upon his departure the impeachment was abandoned yet Parliament agreed on a bill banishing Clarendon for treason and imposing an extensive range of civil disabilities. *Id.,* at 374, 385, 390–391.

The principal objection raised against the impeachment charges was that they did not, under the law of the time, constitute treason. *Id.*, at 342–346, 348–349, 350, 356–360, 367–372. The objection was not, it must be noted, that the charges were premised on innocent conduct. (If that were the nature of the objection, Justice Chase would have used the case to illustrate his first category, rather than his second one.) In fact, the impeachment explicitly alleged that Clarendon violated the law. See *id.*, at 330–333. The objection made by Chase and by later legal scholars was that by the act of banishment the House sought to elevate criminal behavior of lower magnitude to the level of treason, thereby redefining what constitutes a treasonous offense. Even if Parliament assumed, on the basis of Clarendon's flight, that the allegations were true, see *id.*, at 389–390, that constructive admission did not alter the fact that, under the laws of the time, the allegations could not support a charge of treason. By enacting the bill, Parliament declared these allegations sufficient to constitute treason. Some parliamentary colloquy suggested, moreover, that Clarendon was being punished for his flight, rather than for offenses alleged. See *id.*, at 389 ("[I]t is plain, if you proceed upon this bill, you go not upon your impeachment, but because he is fled from the justice of the land"). A flight from justice was not considered an offense so severe as to warrant banishment, "the highest punishment next to death." *Id.*, at 386. If the offense of flight was enhanced because of the prior offenses, then it was an increase in the gravity of the crime after its commission. Either way, the legislation increased the gravity of Clarendon's offense.

The bill passed against Clarendon accomplished what English common-law scholar Richard Wooddeson described as the danger against which the second *ex post facto* category was designed to guard. The bill "ma[de] some innovation, or creat[ed] some forfeiture or disability, not incurred in the ordinary course of law." 2 A Systematical View of the Laws

of England 638 (1792) (hereinafter Wooddeson). It was Wooddeson's interpretation of the English common law that Justice Chase relied upon. See *Calder*, 3 Dall., at 391; *Carmell, supra*, at 522–523, and n. 10; *ante*, at 614. The Court argues that the innovation deplored by Wooddeson was the imposition of a sanction (banishment) which, under settled law, was the prerogative of Parliament, not of the courts. *Ibid.* That may be so, but it cannot help the Court because this is not what California has done. Section 803(g) did not impose any punishment not otherwise contained in the California Penal Code. It did what legislatures have done throughout history: It specified when the criminal justice system may prosecute certain crimes. The majority tries to explain away this distinction as "not determinative," *ibid.*, but it makes all the difference. By imposing on a particular offender a punishment not prescribed by the existing legal norms a legislature signals its judgment that the gravity of the offense warrants its special intervention. In contrast, by prescribing general rules for the adjudication of offenses the legislature leaves the determination of the offender's culpability entirely to the courts.

The majority's explanation of the English precedents, in all events, is not the most logical one. Justice Chase's alternative description covered enactments which "inflicted *punishments*, where the party was not, by *law*, liable to *any punishment.*" *Calder, supra*, at 389. Though only a parliamentary Act could subject an individual to banishment in 17th-century England, Parliament's power to pass such Acts was unquestioned. See 11 W. Holdsworth, A History of English Law 569 (1938). A sanction of banishment was acknowledged as a punishment provided for by the existing laws, both at the time of Clarendon's trial and afterwards. See, *e. g.*, Craies, Compulsion of Subjects to Leave the Realm, 6 L. Q. Rev. 388, 392 (1890) ("[B]anishment, perpetual or temporary, was well known to the common law"); An Act for Punishment of Rogues, 39 Eliz. 1, c. 4, s. 4 (1597) (permit-

ting banishment of dangerous rogues); the Roman Catholic Relief Act, 10 Geo. 4, c. 7, s. 28 (1829) (providing for the banishment of Jesuits). By law, then, a charge of high treason would have made Clarendon liable to banishment, which is inconsistent with Justice Chase's formulation.

To explain away the inconsistency, the Court redefines the words "by law" to refer only to punishments "not otherwise available 'in the ordinary course of law.'" *Ante*, at 614 (quoting 2 Wooddeson 638). As already explained, it was an accepted procedure in 17th-century England for Parliament to pass laws imposing banishment.

The majority must mean, then, that banishment was not available through the courts. At the time of Clarendon's trial, however, British courts were empowered to adjudicate treason and to punish it with death. 1 M. Hale, Pleas of the Crown *348–*351; see also 2 Jowitt's Dictionary of English Law 1799–1800 (2d ed. 1977). If the charges against Clarendon accurately alleged treason, he was eligible, through ordinary judicial proceedings, to receive capital punishment, which was obviously a sanction more severe than banishment. For the majority's historical explanation to work, Justice Chase's alternative description of the second category would have to prohibit laws which inflicted a punishment where the party was not, through normal judicial proceedings, liable to that precise punishment but was liable to a greater one. This formulation can hardly be reconciled with the words Justice Chase used, much less with his principal formulation of the second category. A legislature does not make an individual's crime *"greater* than it was, when committed," *Calder, supra,* at 390, by assigning a punishment less severe than the one available through the courts.

If Justice Chase's reference to Clarendon's trial is to have explanatory power, one must look for an alternative interpretation. What was repulsive to Chase and Wooddeson in Clarendon's trial was not the imposition of banishment as such, but that the sanction was outside the limits of what

Clarendon's offense merited under the law established at the
time of its commission, and was instead premised on Parlia-
ment's exaggeration of the gravity of the offense. Viewed
this way, the Clarendon example lends no support to the ma-
jority's position, but instead undercuts it.

It must be acknowledged that, as the majority points out,
a number of historians have treated one of the charges levied
against Clarendon, that of betraying the King's secrets to
the enemy, as impeachable treason. *Ante*, at 622–623. The
historical judgment, however, is not as uniform as the Court
makes it seem. See 7 E. Foss, Judges of England 130 (1864)
("No one can read the articles [against Clarendon] without
seeing the weakness and frivolity of the allegations, none of
them, even if true, amounting to treason"); R. Berger, Im-
peachment: The Constitutional Problems 45–46 (1974) (ex-
plaining the articles of impeachment against Clarendon as
based on the Parliament's power to declare certain nontrea-
sonous offenses to be treason).

Historians are in agreement, though, that the Commons
could not substantiate the charge of betraying secrets to the
enemy. 2 H. Hallam, Constitutional History of England:
From the Accession of Henry VII to the Death of George II
367, 373 (rev. ed. 1881); Roberts, The Impeachment of the
Earl of Clarendon, 13 Camb. Hist. J. 13–14 (1957); Roberts,
The Law of Impeachment in Stuart England, 84 Yale L. J.
1419, 1426 (1975); Berger, *supra*, at 45, n. 193. It is due to
this absence of evidence that the Commons refused to
produce particulars of the treason charge against Claren-
don, insisting instead the Lords trust their word that the un-
derlying conduct was treasonous. Although the technical
grounds for the Lords' objection to this charge was the lack
of specificity, the objection can also be viewed as reflecting
a belief that the Commons were attempting to aggravate
Clarendon's offenses by labeling them as treason absent any
justification. As Henry Hallam has explained in his re-
spected study of the English constitutional history, "if the

house of lords shall be of opinion, either by consulting the judges or otherwise, that no treason is specially alleged, they should, notwithstanding any technical words, treat the offence as a misdemeanor." 2 Hallam, *supra*, at 413. Justice Chase could have viewed the betrayal of secrets charge in a similar way, as a subterfuge through which the Commons were trying to elevate Clarendon's offenses to the level of treason.

The proposed interpretation of Clarendon's example is reinforced by considering the proceedings against Bishop Francis Atterbury, who, in the midst of hysteria over both real and supposed Jacobite plots, was accused of conspiracy to depose George I. The evidence against Atterbury was meager, and supporters of the Crown, fearing that neither the common-law courts nor even the House of Lords would convict, introduced a bill of banishment. G. Bennett, Tory Crisis in Church and State, 1688–1730, pp. 258–265 (1975); *Bishop Atterbury's Trial*, 16 How. St. Tr. 323, 640 (1723) (reprint 2000) (hereinafter *Atterbury's Trial*). The bill declared Atterbury a traitor, and subjected him to a range of punishments not previously imposed, including exile and civil death. *Id.*, at 644–646; Bennett, *supra*, at 265. The Duke of Wharton, who registered the lengthiest dissent, commented that "this Bill seems as irregular in the punishments it inflicts, as it is in its foundation, and carries with it an unnatural degree of hardship." *Atterbury's Trial* 691. The only bill of comparable harshness was the Act banishing Clarendon. Those sanctions were more mild, *id.*, at 691–692, but, as we have seen, just as violative of the rule against penalties imposed after the fact. As in the case of Clarendon, Parliament adjudged Atterbury's offense to be so grave as to merit a singularly severe punishment. The bill designed vindictive forfeitures and disabilities not imposed in the ordinary course of law.

The Atterbury case illustrates again the close relationship between the second and the third *Calder* categories. See

*supra,* at 639–640 (quoting *Calder,* 3 Dall., at 397 (Paterson, J.)). As already explained, *supra,* at 640–641, the Court's misconstruction of Justice Chase's historical examples takes the second category out of this logical continuum. Contrary to the majority's belief, *ante,* at 625, an interpretation which highlights the link between these two categories is more faithful to the original understanding. Richard Wooddeson, the Court's preferred commentator, discussed these two categories together, noting that both "principally affect *the punishment.*" 2 Wooddeson 638–640; see also *id.,* at 624.

Atterbury's trial also illustrates why the majority's interpretation of the historical examples as premised on the courts' inability to impose banishment is untenable. See *supra,* at 645–646. Had Atterbury been convicted of treason through the courts, he would have been subject to capital punishment. Parliament's decision to prosecute Atterbury may have been driven by fear of backlash provoked by a death sentence, for Atterbury enjoyed considerable popularity and sympathy in some circles. See Bennett, *supra,* at 259. Wooddeson speculated, in an observation in tension with the majority's interpretation, that Atterbury's sentence may have been motivated by a desire "of mitigating punishment." 2 Wooddeson 639. The mitigation, of course, was in comparison to the possible death verdict, not, as already explained, in comparison to the ordinary noncapital punishment Atterbury could have received.

Clarendon's and Atterbury's trials show why Stogner's case does not belong in *Calder's* second *ex post facto* category. The California Legislature did not change retroactively the description of Stogner's alleged offense so as to subject him to an unprecedented and particularly severe punishment. The offense is described in the same terms as before the passage of §803(g); the punishment remains the same. The character of the offense is therefore unchanged; it is perceived by the criminal justice system in the same way as before, and punished with the same force. The only

change is that Stogner may now be prosecuted, whereas prior to the statute the prosecution could not have taken place. These illustrative examples, then, suggest the second *Calder* category encompasses only the laws which, to the detriment of the defendant, change the character of the offense to make it greater than it was at the time of commission.

The majority seems to suggest that retroactive extension of expired limitations periods is "'arbitrary and potentially vindictive legislation,'" *ante*, at 611 (quoting *Weaver* v. *Graham*, 450 U. S. 24, 29, and n. 10 (1981)), but does not attempt to support this accusation. And it could not do so. The California statute can be explained as motivated by legitimate concerns about the continuing suffering endured by the victims of childhood abuse.

The California Legislature noted that "young victims often delay reporting sexual abuse because they are easily manipulated by offenders in positions of authority and trust, and because children have difficulty remembering the crime or facing the trauma it can cause." *People* v. *Frazer*, 21 Cal. 4th 737, 744, 982 P. 2d 180, 183–184 (1999). The concern is amply supported by empirical studies. See, *e. g.*, Summit, Abuse of the Child Sexual Abuse Accommodation Syndrome, in 1 J. of Child Sexual Abuse 153, 156–163 (1992); Lyon, Scientific Support for Expert Testimony on Child Sexual Abuse Accommodation, in Critical Issues in Child Sexual Abuse 107, 114–120 (J. Conte ed. 2002).

The problem the legislature sought to address is illustrated well by this case. Petitioner's older daughter testified she did not report the abuse because she was afraid of her father and did not believe anyone would help her. After she left petitioner's home, she tried to forget the abuse. Petitioner's younger daughter did not report the abuse because she was scared. He tried to convince her it was a normal way of life. Even after she moved out of petitioner's house, she was afraid to speak for fear she would not be

believed. She tried to pretend she had a normal childhood. It was only her realization that the father continued to abuse other children in the family that led her to disclose the abuse, in order to protect them.

The Court tries to counter by saying the California statute is " 'unfair and dishonest' " because it violated the State's initial assurance to the offender that " 'he has become safe from its pursuit' " and deprived him of "the 'fair warning.' " *Ante,* at 611 (quoting *Falter* v. *United States,* 23 F. 2d, at 426; *Weaver, supra,* at 28). The fallacy of this rationale is apparent when we recall that the Court is careful to leave in place the uniform decisions by state and federal courts to uphold retroactive extension of unexpired statutes of limitations against an *ex post facto* challenge. *Ante,* at 613.

There are two rationales to explain the proposed dichotomy between unexpired and expired statutes, and neither works. The first rationale must be the assumption that if an expired statute is extended, the crime becomes more serious, thereby violating category two; but if an unexpired statute is extended, the crime does not increase in seriousness. There is no basis in logic, in our cases, or in the legal literature to support this distinction. Both extensions signal, with equal force, the policy to prosecute offenders.

This leaves the second rationale, which must be that an extension of the expired statute destroys a reliance interest. We should consider whether it is warranted to presume that criminals keep calendars so they can mark the day to discard their records or to place a gloating phone call to the victim. The first expectation is minor and likely imaginary; the second is not, but there is no conceivable reason the law should honor it. And either expectation assumes, of course, the very result the Court reaches; for if the law were otherwise, there would be no legitimate expectation. The reliance exists, if at all, because of the circular reason that the Court today says so; it does not exist as part of our traditions or social understanding.

In contrast to the designation of the crime, which carries a certain measure of social opprobrium and presupposes a certain punishment, the statute of limitations has little or no deterrent effect. See Note, Retroactive Application of Legislatively Enlarged Statutes of Limitations for Child Abuse: Time's No Bar to Revival, 22 Ind. L. Rev. 989, 1014 (1989) ("The statute of limitations has no measurable impact on allegedly criminal behavior, neither encouraging nor deterring such conduct"); Note, Ex Post Facto Limitations on Legislative Power, 73 Mich. L. Rev. 1491, 1513 (1975) ("[W]hile many defendants rely on substantive definitions of proscribed conduct, few rely on many of the numerous laws regulating the enforcement processes"). The Court does not claim a sex offender would desist if he knew he would be liable to prosecution when his offenses were disclosed.

The law's approach to the analogous problem of reliance by wrongdoers in the civil sphere is instructive. We have held that expired statutes of limitations can be repealed to revive a civil action. See, e. g., Chase Securities Corp., 325 U. S., at 314; Plaut v. Sprendthrift Farm, Inc., 514 U. S. 211, 229 (1995). These holdings were made in the areas of contracts and investments where reliance does exist and does matter. We allow the civil wrong to be vindicated nonetheless. If we do so in the civil sphere where reliance is real, we should do so in the criminal sphere where it is, for the most part, a fictional construct.

When a child molester commits his offense, he is well aware the harm will plague the victim for a lifetime. See Briere & Runtz, Post Sexual Abuse Trauma: Data and Implications for Clinical Practice, 2 J. of Interpersonal Violence 367, 374–376 (1987); 1 J. Myers, Evidence in Child Abuse and Neglect Cases § 4.2, pp. 221–223 (2d ed. 1992); Browne & Finkelhor, Initial and Long-Term Effects: A Review of the Research, in A Sourcebook on Child Sexual Abuse 143, 150–164 (D. Finkelhor et al. eds. 1986). The victims whose interests § 803(g) takes into consideration have been subjected to

sexual abuse within the confines of their own homes and by people they trusted and relied upon for protection. A familial figure of authority can use a confidential relation to conceal a crime. The violation of this trust inflicts deep and lasting hurt. Its only poor remedy is that the law will show its compassion and concern when the victim at last can find the strength, and know the necessity, to come forward. When the criminal has taken distinct advantage of the tender years and perilous position of a fearful victim, it is the victim's lasting hurt, not the perpetrator's fictional reliance, that the law should count the higher. The victims whose cause is now before the Court have at last overcome shame and the desire to repress these painful memories. They have reported the crimes so that the violators are brought to justice and harm to others is prevented. The Court now tells the victims their decision to come forward is in vain.

The gravity of the crime was known, and is being measured, by its wrongfulness when committed. It is a common policy for States to suspend statutes of limitations for civil harms against minors, in order to "protec[t] minors during the period when they are unable to protect themselves." 2 C. Corman, Limitation of Actions § 10.2.1, p. 104 (1991). Some States toll the limitations periods for minors even where a guardian is appointed, see id., at 105–106, and even when the tolling conflicts with statutes of repose, id., at 108. The difference between suspension and reactivation is so slight that it is fictional for the Court to say, in the given context, the new policy somehow alters the magnitude of the crime. The wrong was made clear by the law at the time of the crime's commission. The criminal actor knew it, even reveled in it. It is the commission of the then-unlawful act that the State now seeks to punish. The gravity of the crime is left unchanged by altering a statute of limitations of which the actor was likely not at all aware.

The California statute does not fit any of the remaining *Calder* categories: It does not criminalize conduct which was innocent when done; it allows the prosecutor to seek the same punishment as the law authorized at the time the offense was committed and no more; and it does not alter the government's burden to establish the elements of the crime. Any concern about stale evidence can be addressed by the judge and the jury, and by the requirement of proof beyond reasonable doubt. Section 803(g), moreover, contains an additional safeguard: It conditions prosecution on a presentation of independent evidence that corroborates the victim's allegations by clear and convincing evidence. Cal. Penal Code Ann. §§ 803(g)(1), (2)(B) (West Supp. 2003). These protections, as well as the general protection against oppressive prosecutions offered by the Due Process Clause, should assuage the majority's fear, *ante*, at 631, that the statute will have California overrun by vindictive prosecutions resting on unreliable recovered memories. See *United States* v. *Lovasco*, 431 U. S. 783, 789 (1977).

The statute does not violate petitioner's rights under the Due Process Clause. We have held, in the civil context, that expired statutes of limitations do not implicate fundamental rights under the Clause. See, *e. g., Chase Securities Corp., supra,* at 314. For reasons already explained, see *supra,* at 652, there is no reason to reach a different conclusion here.

The Court's stretching of *Calder*'s second category contradicts the historical understanding of that category, departs from established precedent, and misapprehends the purposes of the *Ex Post Facto* Clause. The Court also disregards the interests of those victims of child abuse who have found the courage to face their abusers and bring them to justice. The Court's opinion harms not only our *ex post facto* jurisprudence but also these and future victims of child abuse, and so compels my respectful dissent.