Filed 4/28/16  P. v. Dalton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D069278 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF088836) |
| TODD E. DALTON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Edward D. Webster, Judge.  Affirmed in part, vacated in part, and remanded with directions.


Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

In 2001, a jury found Todd E. Dalton guilty of nine counts charged in an amended information:  three or more lewd and lascivious acts on E.D. in violation of Penal Code section 288.5[1] (continuous sexual abuse), between July 1990 and July 1992 (count 1); three counts of lewd and lascivious acts on E.D. in violation of section 288, subdivision (a), between July 1992 and July 1993 (counts 2, 3, and 4);[2] two counts of forcible sexual penetration of E.D. in violation of section 289, subdivision (a)(1), between July 1992 and July 1993 (counts 5 and 6); continuous sexual abuse of S.D. in violation of section 288.5, between November 1997 and November 1998 (count 7); and two counts of lewd and lascivious acts on S.D. in violation of section 288, subdivision (a), between December 1998 and September 1999 (counts 8 and 9).  When the offenses were committed, each victim was under 14 years old; in July 1990, E.D. was eight, and in November 1997, S.D. was five.  For statute of limitations purposes, the jury found that the offenses in which E.D. was the alleged victim (counts 1 through 6) were corroborated by clear and convincing independent evidence, within the meaning of section 803, subdivision (g) (hereafter, section 803(g)).[3]  The jury also found a special circumstance affecting

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Count 2 was charged in the amended information as a section 288, subdivision (b) violation, but reduced to a section 288, subdivision (a) violation prior to jury deliberations.

[3]    Unless otherwise specified, all references to section 803(g) are to the earliest enacted version of the statute.  (Stats. 1993, ch. 390, §1, p. 2226.)

Dalton's sentence, that is, under section 667.61, subdivision (e)(5), he had committed enumerated offenses on more than one victim.[4]

Based on the jury's verdicts and findings, the trial court imposed sentences to run consecutively for each of the counts, totaling 30 years for counts 1 through 6 followed by three indeterminate terms of 15 years to life for counts 7 through 9.

Dalton raises various claims of error in this appeal. One set of issues relates to his absconding after start of trial, another set of issues relates to evidence admitted at trial of a prior uncharged sexual offense and, finally, he challenges the trial court's sentence. His arguments will be discussed in detail below. For reasons we will explain, Dalton's convictions are affirmed, but his sentence is vacated and the matter remanded to the trial court for resentencing.

FACTUAL BACKGROUND

The People's principal witnesses regarding the charged acts were Dalton's daughters and the alleged victims, E.D. and S.D. In addition, the testimony of Dalton's niece, Tiffany, and Tiffany's mother, R., supported that Dalton had sexually molested then-seven-year-old Tiffany in 1980 (sometimes referred to as the "Tiffany evidence"). The Tiffany evidence will be discussed in detail *post*. The People further presented (1) expert testimony on reasons why children may delay their disclosures of sexual abuse;

---

[4]     Unless otherwise specified, all references to section 667.61, subdivision (e)(5), are to the earliest enacted version of the statute. (Stats. 1993-94, 1st Ex. Sess., ch. 14, § 1, p. 8571.)

3

and (2) evidence to support Dalton's flight from the jurisdiction after start of trial, including his unknown whereabouts and investigators' efforts to locate him.

Dalton and his wife M. had six children together; at trial in 2001, the children were E.D. (19), A. (17), Jason (15), Jonathan (13), Justin (11), and S.D. (8). E.D. testified that Dalton had begun sexually molesting her by the time she was seven, she had clear memories of being sexually molested when they lived in the "Corona house" (prior to her being 10), and the molestation continued after the family's move to a home in Riverside around July 1992 after E.D. had turned 10. The abuse was frequent and each encounter involved various kinds of offensive acts—"[w]henever he did stuff, a lot of things happened at one time . . . most all parts of the body were touched on numerous times."

While living in the Corona house, E.D. clearly remembered an incident where Dalton stuck his finger through a hole in the crotch area of her shorts and touched her vagina. Then, continuing every year until she was at least 14, Dalton would undress her and insert his fingers into her vagina while she lay on a bed. He touched her breasts at least once a week. Dalton did these acts in the guise of an examination and/or to "see how [she] was developing." He also put a "device, a machine, that had two little probes" on her nipples, chest, and vaginal area, explaining that he was treating her hernia. Further, while living in Riverside, under the pretext of showing her an exercise that would strengthen her for childbirth, E.D. testified that Dalton twice "stuck his finger up my vagina, and he had me squeeze some type of muscle."

4

E.D. described the most typical molestation "routine," which happened on a weekly basis beginning when she was about 10. It would start with Dalton wanting his back or stomach rubbed in her parents' bedroom, where he relaxed after work at night. Dalton would show her what to do or tell her to "go lower" or "higher" until she was rubbing his "dick." Sometimes he made E.D. rub other parts of his genitals, and sometimes he would ejaculate. He sometimes gave her money after these sessions. He would often tell her to close her eyes while the molestations occurred.

Incidents also occurred outside of Dalton's bedroom. For example, in one incident while living in Riverside, Dalton drove E.D. to a garage sale to buy a large fish tank. They stopped at Dalton's office, where he made her rub his penis. Another incident occurred on a trip to Catalina Island, where E.D. remembered being made to rub Dalton's penis and being very frightened that her sleeping brothers would wake up. E.D. recalled yet another incident where Dalton came into her room at night, rubbed her chest, sucked and fondled her nipples, and tried to wake her up. E.D. pretended to be asleep the whole time.

A different incident in their Riverside home started with Dalton ostensibly showing E.D. how to shave her pubic hair, some of which was visible from her bathing suit bottom. E.D. distinctly remembered lying on her parents' bed, with her suit bottom off, and Dalton using a dry razor (a "disposable one") to shave the sides of her pubic area. During this incident or one just like it where E.D. was "laying halfway over the bed," Dalton pressed his penis ("the tip . . . of his dick") on her vagina and "put pressure on it."

5

She "backed up" from the pressure because it hurt. E.D. also remembered her father telling her not to let any guys do the same thing to her until she was married.

According to E.D., her father's conduct made her uncomfortable and she would try to verbally resist by saying "no" or claiming that she needed to be elsewhere, but she had not tried to physically get away. Her father had explicitly warned her not to tell her mother, and E.D. was scared of breaking up the family. E.D. did not want to cause her parents to get divorced, and she was not sure anyone would believe her. Finally, Dalton assured E.D. that he was helping her to overcome "embarrass[ment]" with her future husband, and Dalton would not need to repeat his conduct on S.D.

E.D. eventually did tell her mother about being sexually molested, when she learned, around the summer of 1999, that S.D. was being sexually molested by Dalton. S.D. testified at trial that when she was around six, her father had touched her vaginal area and buttocks (her "front bum and back bum") in a way she did not like multiple times. Furthermore, she described being made to masturbate Dalton to ejaculation on a recurring daily or weekly basis. S.D. testified that she would "squeeze with [Dalton's] shirt, and some white stuff came out of his bum in the front." She described squeezing on her father's lower abdomen region on what she believed to be his "dick" or his skin ("something . . . it had a little crack in it") until "white stuff came dripping down." Dalton would tell S.D. to close her eyes when she was performing these acts. He referred to the white stuff as "power," and he would wipe it off with paper towels. S.D. would receive $1 or $5 from Dalton after masturbating him, and he told her more than once not

6

to tell anyone. With respect to what was happening with her father, S.D. "knew something was going wrong," and eventually told her sister E.D. and mother.

The principal defense witnesses were Dalton's oldest sons, A. and Jason. Besides testifying generally to their father's good character, A. and Jason said they had seen their mother and E.D. "coaching" S.D. on her court testimony and otherwise influencing S.D. to testify against her father.[5] Letters written by A. and Jason to their father, grandfather, and/or father's attorney, documenting their observations of M.'s activities, were admitted in evidence. A. and Jason testified that, to them, S.D. had denied any wrongdoing by Dalton. Neither A. nor Jason believed their father had done anything wrong. A. also recalled being on the "fish tank" trip with Dalton and E.D. Despite having made some prior inconsistent statements, A. maintained at trial that there had been no stop at his father's office during the fish tank trip.

On rebuttal for the prosecution, Justin indicated that the letters he and his brothers had written were done at Dalton's behest. Further, Jonathan remembered S.D. being alone with Dalton in their parents' locked bedroom multiple times, and after these sessions, she would come out of the room with money.

---

[5] A.'s credibility was significantly called into question. He had sexually molested S.D. when he was 13 and 16, and admitted being repeatedly dishonest about his own conduct to various law enforcement officers.

DISCUSSION

I.      *Dalton's Voluntary Absence From Trial*

      A.      *Additional Background*

One set of issues raised by Dalton on appeal relates to his absconding after start of trial, while on bail, and remaining absent for over 13 years.  The original information filed in June 2000 against Dalton, on which he was arraigned and pleaded not guilty, charged the following counts:  (1) continuous sexual abuse against E.D. between July 1990 and July 1992; (2) a lewd and lascivious act on E.D. by force or duress between July 1992 and July 1993; (3) continuous sexual abuse against E.D. between July 1992 and July 1993; (4) and (5) forcible sexual penetration of E.D. between July 1992 and July 1993; (6) continuous sexual abuse of S.D. between November 1997 and November 1998; and (7) continuous sexual abuse of S.D. between November 1998 and September 1999.  Dalton denied the section 667.61, subdivision (e)(5) special circumstance alleged in the information.  He was present in court for numerous hearings and pretrial proceedings in 2000 and 2001.

On July 24, 2001, trial commenced and jury selection began.  On July 26, 2001, jury selection concluded, and the jury was ordered to return to court in several days to be sworn in.  Also on July 26, after hearing the arguments of counsel on motions in limine, the court decided it would admit the Tiffany evidence (prior uncharged sexual offense by Dalton).  Further, the district attorney presented the court and Dalton's counsel with a copy of the amended information, which was filed that same day.  Dalton and his counsel

had received a preliminary version of the amended information several days prior. Dalton was present in court during all these proceedings.

The amended information alleged an exception to the statute of limitations (for counts 1 through 6), and replaced one count of continuous sexual abuse against E.D. and S.D., respectively, with two counts of lewd and lascivious acts in violation of section 288, subdivision (a). Defense counsel received the amended information in Dalton's presence and stated, "I would be prepared to go forward with today's arraignment if counsel and the Court would agree that I can reserve a right to demurrer until Monday [July 30, 2001]." However, Dalton's counsel ultimately requested arraignment be deferred over the weekend, which was granted by the court.

On Monday, July 30, 2001, Dalton did not appear for trial (and his rearraignment), and he could not be located. His counsel reported that Dalton's car and car keys had been found in front of his father's business, and that Dalton had complained of chest pains after his last court appearance. The court forfeited Dalton's bail and issued a warrant for his arrest. Several conferences with counsel followed on whether and how to proceed. The court found that Dalton had voluntarily absented himself from trial, referencing the "highly, highly suspicious circumstances" of Dalton's disappearance.[6] The court summed up its belief as follows: "To permit [Dalton] to take advantage of his own wrong by disappearing . . . would pervert the ends of justice. He'll have a trial. All due process rights will be observed. And to stop the proceedings at this point because of this

---

[6] Dalton remained absent throughout trial. Investigators searched for him at local motels, coroners' offices, hospitals, and airports.

9

technical entry of a not guilty plea on his behalf . . . would really pervert the justice system."

Invoking its statutory authority to do so, the court found that Dalton was constructively refusing to enter a plea, and the court entered a "not guilty" plea on his behalf. The court found Dalton had notice of the charges against him, he was in the courtroom when the amended information was presented, discussed, and filed by the People, and the charges were not substantially different than those contained in the original information. The court discussed its concerns regarding the jury's and public's perception of the justice system if he were permitted to avoid trial under the circumstances.

Dalton remained missing for 13 years until he was arrested in March 2014 on the outstanding warrant. His motion for new trial was denied, and he was sentenced in December 2014. He told probation officers he had fled during his trial because of fear of conviction and threats of being physically harmed in jail.

B.      *Whether Trial Could Proceed on the Amended Information*

Dalton contends he could not be tried on charges for which he was not arraigned, and the trial court's proceeding on the amended information resulted in a "miscarriage of justice," i.e., his convictions resulted from a trial in which his essential rights were disregarded or denied. (*People v. Wilson* (1913) 23 Cal.App. 513, 524.) He argues that he had a right to be present and formally told the charges he would be tried on, and the court had no legal basis to enter a not guilty plea on his behalf.

10

We conclude there was no miscarriage of justice by the trial court's proceeding on the amended information. A defendant generally has a right to be personally present at his arraignment on felony charges. (See § 977, subd. (b).) An arraignment informs the accused of the charge and gives him an opportunity to plead. (*People v. Carter* (1966) 245 Cal.App.2d 48, 50.) However, failure to rearraign is not cause for reversal when the defendant's substantial rights are observed, such as when changes in the amended information are "minor," *People v. Williams* (1980) 106 Cal.App.3d 15, 19, derive from evidence adduced at the preliminary hearing, *id.* at page 20, and/or the defendant receives the full benefit of a not guilty plea, *People v. Walker* (1959) 170 Cal.App.2d 159, 164. Early on, our Supreme Court recognized that the rule regarding in-person pleas is intended to protect defendants from a *guilty* plea, but there could not be "any possible harm to the rights of the prisoner" from entry of a not guilty plea and denial of every charged allegation. (*People v. Thompson* (1854) 4 Cal. 238, 242 ["While the law will not allow an attorney or counsel to admit away the life or liberty of a party, there can be no danger in permitting him to plead to the whole charge, and put the State to the proof of the offense"].)

Dalton's substantial rights were observed in this case. He and his counsel had notice and actual knowledge of the charges contained in the amended information; in fact, Dalton was physically present in court when the prosecutor provided the amended information. The offenses charged in the amended information involved the same underlying acts of sexual molestation against E.D. and S.D. as charged in the original information. The day that Dalton failed to appear, defense counsel did not intend to

11

demur, and Dalton's in-person plea of not guilty would have been a formality.  Indeed, his counsel had essentially been prepared to have Dalton plead not guilty the previous week.  Contrary to Dalton's argument, the trial court did not commit a legal error by entering a not guilty plea and denials of all allegations on his behalf.  (See § 1024 ["If the defendant refuses to answer the accusatory pleading, by demurrer or plea, a plea of not guilty must be entered"].)  Due to Dalton's voluntary absence while knowing the charges against him, the court found that Dalton was constructively refusing to answer the amended information.  Accordingly, the court was statutorily permitted to direct the entry of a not guilty plea.

Moreover, as we discuss further below, the trial court was understandably concerned about public perception of the judicial system's effectiveness if Dalton's absconding could impede substantial justice.  After being arrested in 2014, Dalton effectively admitted that he had fled to avoid trial and conviction.  The trial court did not err in proceeding with trial on the amended information.

C.      *Whether Dalton Could Receive a Fair Trial*

Dalton next contends he could not and did not receive a fair trial in his voluntary absence.  We disagree.

A defendant's right to be personally present at trial may be waived expressly or implicitly.  (*People v. Concepcion* (2008) 45 Cal.4th 77, 82.)  When a defendant is present at start of trial but later voluntarily absents himself—such as by absconding while on bail or escaping from custody—trial may proceed in his absence.  (*Id.* at p. 83; § 1043, subd. (b)(2).)  Section 1043, subdivision (b)(2), "provides the trial court with clear

12

guidance and direct authority to ensure the orderly process of trial when a defendant is absent voluntarily." (*Concepcion*, at pp. 83-84 [discussing the effect of delays and disruptions on the proper administration of justice].)

Based on our review of the record, Dalton voluntarily and intentionally absented himself from trial. During motions in limine, Dalton heard that the court would permit the jury to consider the Tiffany evidence, heard that the charges involving E.D. were not necessarily time barred, he was scared of being convicted and imprisoned, and he fled. Further, the trial court discussed the inconveniences suffered and accommodations made by the court, counsel, witnesses, and jury, which was already impaneled, and the public's view of the justice system if he were permitted to evade prosecution. Dalton's rights were reserved, but he waived them by choosing to be absent; any unfairness arising from his decision to flee was his own doing. The trial court did not err in proceeding with Dalton's trial in his voluntary absence.

D. *Reporter's Notes of Voir Dire*

Dalton complains that missing reporter's notes of voir dire, apparently destroyed while he was at large, violates his due process rights because he does not have a complete record on appeal. In May 2015, Dalton filed a request to augment the appellate record with voir dire transcripts, claiming an insufficiency in voir dire based on the jury having been allegedly given an incorrect statement of law. He contends the jury was told that E.D.'s testimony alone could support a conviction on the charges involving her, which was rendered inaccurate by the statute of limitations allegation under section 803(g). In response to Dalton's augment request, a Riverside County court reporter returned an

13

affidavit of "no notes," declaring he had carefully and thoroughly searched for the requested notes, but had concluded "that the notes no longer exist, as they are outside the required ten-year period that we are required to retain the notes under the Code." At no point did Dalton request a preservation order.

Dalton has not shown prejudice from the unavailable reporter's notes or any viable issue concerning voir dire. Although rule 8.324 of the California Rules of Court permits a party to apply to have the reporter's transcript of voir dire included in the record, the rule does not affect the standard retention or destruction of reporters' notes. Dalton does not contest that the court reporter's notes were the subject of routine and lawful destruction. (See *People v. Everett* (1990) 224 Cal.App.3d 932, 937; Gov. Code, § 69955.) Moreover, even if there was an incomplete statement of law during voir dire, there was no prejudice to Dalton because the jury was extensively instructed prior to deliberations on the level of proof required under section 803(g), which we presume the jury understood. Otherwise, as the trial court noted, it is not an incorrect statement of law that one witness's testimony alone is sufficient to prove any given fact. Dalton has not demonstrated any violation of his due process rights.

II.     *Evidence of Prior Sexual Misconduct*

A.     *Additional Background*

The next set of issues raised by Dalton relates to evidence of him sexually molesting Tiffany, which the trial court ruled on motions in limine would be admitted under Evidence Code sections 1108, 1101, subdivision (b), and 352. The court found the acts described by Tiffany to be substantially similar to the charged offenses, insofar as all

14

the girls were within the same age range when the molestations began, were distinctively offered monetary rewards, and were solicited in the same manner to engage in the same kind of conduct. Thus, the court decided the Tiffany evidence was highly probative on a number of issues in the case, including Dalton's propensity, intent, and use of a common plan. Moreover, the court did not believe the testimony would consume an undue amount of time or cause confusion, and it was no more inflammatory than the charged acts. Finally, the court carefully considered that although the prior acts were somewhat remote in time, Dalton had evidence available to him that could be used to impeach Tiffany's memory.

The evidence of prior sexual misconduct can be summarized as follows. During the summer when she was seven, Tiffany recounted that she had been sexually molested by Dalton, who was around 21.[7] They were at her grandfather's office in a warehouse, locking up the building for the night. Dalton said to Tiffany that if she would rub his shoulders, he would give her $5. Tiffany first began rubbing his shoulders and, then at Dalton's request, moved to rubbing his feet and legs. He kept saying "go higher" until she was rubbing his penis. Tiffany remembered her eyes were closed, though she could not remember why she had closed them. Dalton's penis was erect, he put his hand over hers on his penis, and made her "do . . . [rubbing] motions." At the time, Tiffany believed what was happening was "wrong," but did not understand exactly what was

---

[7] Tiffany's mother, R., is Dalton's half sister through their biological father, Ron. Tiffany was 28 years old at trial and had lived a large part of her life in Northern California. During some of her childhood summers, Tiffany would be sent to visit Southern California and the Dalton family, including Dalton.

15

happening. As an adult, she understood that Dalton was "close to orgasming." He stopped abruptly when he heard a noise outside.

Tiffany further testified that she did not tell anyone about the incident until she was 16, when she told her mother. Tiffany had heard that "the Daltons" were coming to visit them, and she asked R. whether "Todd" would also be visiting. Tiffany told R. that her 11-year-old sister S. should not be left alone with Dalton. Tiffany proceeded to tell R. that Dalton had molested her as a child. R. fully corroborated the disclosure, recalling that she had been outdoors gardening at the time, and afterwards, a large earthquake hit the San Francisco area. R. did not take any further action out of respect for Tiffany's wish to move on. At the time, Tiffany believed Dalton had just been young and made a mistake.

More recently, R. received a phone call from her aunt Joyce (Ron's sister) on an unrelated matter and, during that call, Joyce mentioned that Dalton had been accused by his children of molesting them. Upon hearing this and knowing what Tiffany had told her, R. got "very sick to [her] stomach," vomited, and ended the phone call. Neither R. nor Tiffany was aware of any details of what Dalton allegedly had done to his children. Tiffany independently sought out the Riverside County District Attorney because she felt guilty for not saying anything earlier.

B. *Whether the Tiffany Evidence Was Erroneously Admitted*

Dalton contends the Tiffany evidence should not have been admitted for the jury's consideration because it was substantially more prejudicial than probative under

16

Evidence Code section 352. He argues the evidence was overly prejudicial because of its relative strength compared to E.D.'s and S.D.'s testimony.

"Subject to Evidence Code section 352, Evidence Code section 1108 permits a jury to consider prior incidents of sexual misconduct for the purpose of showing a defendant's propensity to commit offenses of the same type, and essentially allowing such evidence to be used in determining whether the defendant is guilty of the current sexual offense charge." (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1096.) Although there is a risk of unfairness inherent in all propensity evidence, the Legislature has determined that the need for uncharged sexual offense evidence is critical given the serious and secretive nature of sex crimes. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Trial courts must determine whether the probative value of such evidence is substantially outweighed by the possibility of undue consumption of time, danger of undue prejudice, confusion of issues, or misleading the jury. (*Id.* at p. 917.) The weighing process is "entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." (*People v. Fitch* (1997) 55 Cal.App.4th 172, 183 (*Fitch*).)

In evaluating propensity evidence under Evidence Code section 352, trial judges "must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives. . . ." (*Falsetta,*

17

*supra,* 21 Cal.4th at p. 917.)  We will not find that a court abuses its discretion in admitting other sexual acts evidence unless its ruling " 'falls outside the bounds of reason.' "  (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)  We will only disturb a trial court's ruling under Evidence Code section 352 where the court has exercised its discretion in a manner that has resulted in a miscarriage of justice.  (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42.)

In addition, irrespective of Evidence Code section 1108, evidence of other uncharged acts may be admitted if such evidence tends to be relevant on an issue other than to establish defendant's propensity or disposition to commit the charged offenses. (Evid. Code, § 1101, subd. (b); *People v. Balcom* (1994) 7 Cal.4th 414, 424 [uncharged offenses can show "manifestations of a common design" or plan that defendant employed or developed in committing the charged offenses].)  Evidence Code section 1101, subdivision (b) provides examples of potentially relevant nondispositional facts, including intent, plan, or absence of mistake.

The record shows that the court conducted a thorough balancing test, and its decision to admit the Tiffany evidence was reasonable.  (See *People v. Soto* (1998) 64 Cal.App.4th 966, 991 [evidence of defendant's prior acts was "extremely probative of appellant's sexual misconduct when left alone with young female relatives"].)  The uncharged and charged acts shared remarkable similarities, including characteristics like Dalton offering to pay the young girls; the incidents would begin with a backrub and culminate with masturbating him; the girls were told to close their eyes; and they were similar ages when the abuse began.  Tiffany's testimony made it more likely that E.D. and

18

S.D. were telling the truth about what had happened to them (and vice versa). The similarities between the uncharged and charged acts also support the inference that Dalton had a common method, design, or plan of molesting his young female family members, which he could claim to be a mistake or an accident individually but was far more likely to be intentionally wrongful once a pattern was established.

The trial court recognized that Dalton faced a burden in defending against the uncharged offense, which had happened many years ago. Nevertheless, the court noted that Dalton had methods of impeaching Tiffany's recollection. The likelihood of jury confusion or distraction was low given that Tiffany provided a clear, coherent account of what happened to her, had only one encounter to testify about, and otherwise had little or no interaction with members of the Dalton family.

Finally, we are not persuaded by Dalton's argument that the Tiffany evidence was overly prejudicial due to its relative clarity compared to E.D.'s and S.D.'s testimony. " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) The uncharged acts were no more likely to evoke an emotional bias against Dalton than the charged acts, which were more depraved and prolonged. As explained above, the Tiffany evidence was highly relevant. The trial court did not abuse its discretion in admitting evidence of prior sexual misconduct.

19

C.	*Propriety of Using the Tiffany Evidence as Corroboration under Section 803(g)*

Dalton next challenges the use of the Tiffany evidence to corroborate the offenses against E.D. under Penal Code section 803(g).  He contends that use of prior sexual misconduct evidence for section 803(g) corroboration violated ex post facto principles because Evidence Code section 1108 became effective after the commission of Dalton's crimes involving E.D.  He separately contends that evidence of prior sexual misconduct admitted under Evidence Code section 1108 should not be permitted to be used as section 803(g) corroboration.

Prior to 1999, section 803(g) provided in pertinent part, "(1) Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section  . . . 288, 288a, 288.5, 289 . . . . [¶]  (2) This subdivision applies only if both of the following occur:  [¶]  (A) The limitation period specified in Section 800 or 801 has expired.  [¶]  (B) The crime involved substantial sexual conduct . . . and there is *independent evidence that clearly and convincingly corroborates the victim's allegation*.  No evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial." (§ 803(g), italics added.)  The Legislature added section 803(g) to the statutory scheme to permit prosecution of specified crimes for an additional period—within one year of the time the victim reports an independently corroborated crime to law enforcement officials.  (*People v. Frazer*

20

(1999) 21 Cal.4th 737, 742, abrogated by *Stogner v. California* (2003) 539 U.S. 607 (*Stogner*), as to crimes with previously expired limitations periods.) Requiring the prosecutor to produce independent corroborating evidence under section 803(g) is a "procedural burden" to bringing a criminal complaint. (*People v. Zandrino* (2002) 100 Cal.App.4th 74, 85 (*Zandrino*).)

We first address Dalton's ex post facto argument. At the time of Dalton's alleged crimes against E.D. in the early 1990's, Penal Code section 803(g) and Evidence Code section 1108 were not effective. By its own terms, Penal Code section 803(g) became effective on January 1, 1994. (Pen. Code, § 803, subd. (g)(3).) Evidence Code section 1108 became effective on January 1, 1996. (*Fitch*, *supra*, 55 Cal.App.4th at p. 185.) Dalton argues that use of propensity evidence to serve as Penal Code section 803(g) corroboration in this case was an ex post facto violation since propensity evidence would not have been admissible prior to 1996.

We conclude that Dalton has not established an ex post facto violation. "The traditional understanding of the ex post facto clause was expressed in *Beazell v. Ohio* (1925) 269 U.S. 167, 169-170 [citations], as follows: 'It is settled . . . that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with [a] crime of any defense available according to law at the time when the act [was] committed, is prohibited as ex post facto.' " (*People v. Delgado* (2006) 140 Cal.App.4th 1157, 1164 (*Delgado*).) Courts have found that application of Evidence Code section 1108 to offenses that occurred prior to its

21

enactment does not violate the ex post facto clause because the statute does not affect the sufficiency of evidence required for a criminal conviction. (*Fitch, supra*, 55 Cal.App.4th at p. 186; *People v. Flores* (2009) 176 Cal.App.4th 1171, 1181.) In addition, the Legislature may extend a statute of limitations before it has expired without violating the ex post facto clause. (*Stogner, supra*, 539 U.S. at p. 618.) Penal Code Section 803(g) has been so upheld. (*People v. Terry* (2005) 127 Cal.App.4th 750, 775 ["[E]xtensions of existing, unexpired limitations periods are not ex post facto because such extensions do not resurrect otherwise time-barred prosecutions."].)

Here, if Dalton had been prosecuted prior to 1996 for sex crimes against E.D., the statute of limitations would not have been a defense. (Penal Code, § 800 [six-year limitations period].) At the time of Dalton's trial in 2001, the state was thus required to meet a procedural hurdle that it was not previously required to meet. (*Zandrino, supra*, 100 Cal.App.4th at pp. 83-84.) Use of propensity evidence as corroboration under section 803(g) did not constitute an ex post facto violation because, compared to the law in effect at the time of the crimes' commission, Dalton was not deprived of a defense available to him, criminal conduct was not redefined, and less evidence was not required to convict him. The Tiffany evidence was also admitted under Evidence Code section 1101, subdivision (b). Dalton has not demonstrated that use of the Tiffany evidence to satisfy Penal Code section 803(g)'s corroboration requirement violated the ex post facto clause.

We next address Dalton's argument that propensity evidence should not be permitted to serve as section 803(g) corroboration. He concedes that current law permits

22

such use. As various courts have noted, evidence of prior sexual misconduct carries a significant and unique probative value in cases involving sex crimes. (E.g., *People v. Yovanov* (1999) 69 Cal.App.4th 392, 403-404 (*Yovanov*); see also *People v. Mabini* (2001) 92 Cal.App.4th 654, 659 [concluding that evidence of a single uncharged offense against a different victim provided sufficient corroboration under § 803(g)].)

Here, the uncharged sexual offense supported characteristic features of Dalton's molestation "routine" and the fact of a common plan—more than just a general status of him being a child molester. The evidence tended to connect Dalton with the commission of the offense. Also, like in *Yovanov*, there was other independent evidence supporting E.D.'s allegations, including S.D.'s testimony of being sexually molested and, to an extent, her brothers' testimony regarding Dalton's retiring into his bedroom after work and obtaining massages from the children. The trial court properly permitted the jury to consider whether the Tiffany evidence (as well as other evidence) clearly and convincingly corroborated E.D.'s allegations for purposes of section 803(g). Dalton has failed to demonstrate any errors regarding evidence of prior sexual misconduct.

III. *Sentencing*

Dalton's remaining claims raise sentencing issues. He contends that the trial court erred by sentencing him on count 7 to serve a term of 15 years to life in state prison under the so-called "One Strike" law (§ 667.61, subd. (b)), because section 288.5 was not a triggering offense under the One Strike law until after Dalton committed the crime, and the sentence he received is more severe than the sentence he would have received under the law in effect at the time he committed the crime. The People concede the error,

23

which we conclude is appropriate. Therefore, we will vacate the sentence imposed on count 7 and remand for imposition of a determinate sentence.

Dalton also challenges the trial court's sentences on counts 8 and 9. On those counts, the court sentenced him to terms of 15 years to life in state prison under former section 667.61, subdivision (e)(5), which authorizes such a sentence when "[t]he defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim." Dalton contends the sentences are unlawful because they have been imposed based on conduct that occurred before section 667.61, subdivision (e)(5) went into effect, in violation of ex post facto principles. Dalton acknowledges that his precise claim was rejected by this district in *People v. Acosta* (2009) 176 Cal.App.4th 472, 475-477 (*Acosta*), in reliance on *People v. Alvarez* (2002) 100 Cal.App.4th 1170, 1179 (*Alvarez*), but he urges that the cases were wrongly decided.

"Section 667.61, subdivision (e)(5), does not require that the crimes against the other victim have been subject to the one strike law when they were committed." (*Alvarez, supra,* 100 Cal.App.4th at p. 1179.) The *Alvarez* court analogized to cases involving the "Three Strikes" law, which hold that the Three Strikes law can be applied to an offense committed after the law's effective date, even though the qualifying "strikes" were committed before the law's effective date. (*Ibid.*, citing *People v. James* (2001) 91 Cal.App.4th 1147, 1150.) In *Acosta*, the court discussed that at the time of the defendant's committing his later offense, he was on "notice" of the One Strike law but chose to be a repeat offender. (*Acosta, supra,* 176 Cal.App.4th at p. 476.) Thus, the

24

central concern to ex post facto prohibitions was not implicated. (*Ibid.*; see also *People v. Grant* (1999) 20 Cal.4th 150, 162 [conviction for continuous sexual abuse based on some conduct that predated enactment of § 288.5 was not ex post facto as offenders had " 'fair warning' " that continuing to engage in sexual abuse of a child would subject them to punishment].)

We agree with the above principles. Section 667.61, subdivision (e)(5), gave fair warning to those who committed specified sexual offenses before it took effect that if they committed sexual offenses against another victim after the law's effective date, they would be subject to increased punishment. Dalton's sentences of 15 years to life on counts 8 and 9 (involving S.D.) do not violate the ex post facto clause because those crimes occurred after section 667.61, subdivision (e)(5), went into effect (in 1994), and Dalton was convicted in the same case of lewd and lascivious acts against E.D. We are not convinced by Dalton's arguments that a defendant must have been first convicted of (or have a meaningful awareness of having committed) criminal acts against one victim before the multiple victim circumstance can apply. The plain language of the statute does not support his position. The trial court properly imposed indeterminate terms on counts 8 and 9.

Finally, Dalton challenges the trial court's imposition of consecutive terms on counts 7, 8, and 9.[8] In imposing those sentences the trial court stated, in pertinent part,

---

[8]    Dalton also asserts that the trial court erroneously believed it was mandatory to impose a consecutive term on count 1. Based on our review of the record, the trial judge

25

"as a result of the passage of the three-strikes law under [section] 667[, subdivision] (c)(6), a consecutive sentence is mandatory. So it's my belief that the sentences on Counts 7, 8, and 9 are life sentences, consecutive. . . ." Later, the court reiterated, "the strike laws that were in effect for counts 7, 8, and 9" required those terms to be consecutive. Dalton's counsel requested the minimum sentence permitted under the law, but did not specifically object to the trial court's recitation of the law. Nevertheless, we will address the sentencing issue on the merits. (See *People v. Welch* (1993) 5 Cal.4th 228, 236 [discussing reviewing courts' unwillingness to ignore clear and correctable legal errors in the sentencing context].)

The People acknowledge that when counts 7 through 9 (violations of §§ 288.5 and 288, subdivision (a)) were committed between 1997 and 1999, there was no law mandating consecutive sentences for those counts. Section 667, subdivision (c)(6), the Three Strikes law invoked by the trial court, certainly did not apply because Dalton did not have any prior serious and/or violent felony convictions. In addition, counts 7 through 9 are not crimes included in former section 667.6, subdivision (d), and therefore consecutive sentences are not mandatory. The trial court retained discretion to impose either concurrent or consecutive sentences. (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524; *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262 ["In exercising its discretion whether to impose concurrent or consecutive terms, a trial court should consider the factors set forth in California Rules of Court, rule 4.425 . . . ."].) Because

did not believe a mandatory consecutive term was required on count 1, but was inclined to sentence it that way.

26

the trial court mistakenly believed consecutive sentences were mandatory and did not otherwise indicate that it was aware it had discretion to choose concurrent sentences for counts 7 through 9, its imposition of those sentences was not an exercise of the court's discretionary sentencing authority. On remand, the trial court is directed to exercise its discretion on whether to impose consecutive or concurrent sentences for counts 7 through 9.

## DISPOSITION

The judgment of conviction is affirmed as to all counts. The sentence is vacated and the case remanded for resentencing. The trial court shall impose a new sentence on count 7 based on the determinate sentences applicable at the time of the offense and exercise its discretion in determining whether the sentences on counts 7, 8, and 9 should be served concurrently or consecutively. The court is direct to prepare and amended abstract of judgment reflecting the resentencing and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

McINTYRE, J.

27